# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 02-3843

_____

Iowa Network Services, Inc.,      *
     *
         Appellant,      *
     *      Appeal from the United States
     v.      *      District Court for the
     *      Southern District of Iowa.
Qwest Corporation,      *
     *      [PUBLISHED]
         Appellee.      *

_____

Submitted: October 23, 2003
Filed: April 7, 2004

_____

Before BYE, HANSEN, and MELLOY, Circuit Judges.

_____

HANSEN, Circuit Judge.

Iowa Network Services, Inc. (INS) brought suit against Qwest Corporation (Qwest) in federal district court seeking to collect amounts allegedly due under INS's federal and state telecommunications tariffs for services INS provided in connecting wireless calls to rural Iowa local telephone companies. The district court dismissed the action as precluded by the Iowa Utility Board's prior decision that INS's tariffs did not apply to the services provided. INS appeals the dismissal, and we reverse and remand for further proceedings.

## I.

Individual telephone companies provide local telephone service or "telephone exchange service" to customers within the telephone company's local exchange area. A number of small independently owned telephone companies provide much of the local telephone exchange service to the residents of Iowa. Each company serves a well-defined localized geographic area, and the companies are referred to as local exchange carriers or LECs. See 47 U.S.C. § 153(26) (defining "LEC"). Qwest, providing both local and long-distance telephone service in Iowa and fourteen other states, is also a LEC to the extent that it supplies local telephone service in many Iowa communities. LECs typically own the wires, computer switches, and related facilities needed to provide telephone service to their customers. In 1987, nearly 150 of the small, independently-owned LECs in Iowa joined together and formed INS. Membership in INS allows each independent LEC to utilize INS's expanded centralized network as its own. Qwest is not a member of INS.

Even after the 1980s breakup of the AT&T telecommunications monopoly, which, inter alia, divested AT&T of its local exchange carriers, local telephone service continued to be viewed and operated as a natural monopoly, with state utility boards, or commissions, giving one local telephone service provider exclusive coverage of a given geographic area. The Telecommunications Act of 1996 (1996 Act), 47 U.S.C. §§151-615b, fundamentally restructured local telephone markets and the regulatory scheme that governed them. No longer could states enforce laws that impeded competition in the local markets. No longer was the local market to be viewed as a natural monopoly with only one authorized provider of local telephone service. To the contrary, the 1996 Act required local exchange carriers to facilitate local competition by sharing their networks with their new competitors. The 1996 Act also thrust the federal government into the local telephone market regulatory arena, which had previously been the exclusive domain of the states. MCI Telecomm. Corp. v. Bell Atl. Pa., 271 F.3d 491, 497 (3d Cir. 2001) ("The Act

2

requires that local service, which was previously operated as a monopoly overseen by the several states, be opened to competition according to standards established by federal law."), cert. denied, 537 U.S. 941 (2002). The new relationship between the federal government (through the Federal Communications Commission (FCC)), the federal courts, and the state commissions in regulating local telephone markets and the competing providers of telephone services in those markets is at the heart of this case.

As relevant to this case, there are two types of charges which one carrier can extract from another for the provision of telecommunication services. The first deals with local telephone service. As noted above, one of the primary purposes of the 1996 Act was to promote competition in the local telephone service market. To facilitate that purpose, the Act requires incumbent LECs[1] (ILECs) to interconnect with another carrier providing local telephone service to a person within the ILEC's local exchange. See 47 U.S.C. § 251(c)(2) (providing that each ILEC has "[t]he duty to provide, for the facilities and equipment of any requesting telecommunications carrier, interconnection with the [LEC's] network for the transmission and routing of telephone exchange service and exchange access" with quality at least equal to that provided the ILEC's own customers and at reasonable rates and conditions). Without the interconnection requirement, a competing new LEC would not be able to connect its customers to a customer served by the ILEC without building its own infrastructure to serve both customers. Under the 1996 Act, the amount an ILEC can charge for allowing a competitor to use its infrastructure to deliver a local call is to be determined by an interconnection agreement negotiated (or imposed by arbitration) between the ILEC and the interconnecting carrier that has been approved by the state commission. See 47 U.S.C. §§ 251(c)(1); 252(e).

---

[1]An incumbent LEC is the LEC that was in existence and providing local exchange service to a given area on the effective date of the 1996 Act, February 8, 1996. 47 U.S.C. § 251(h).

3

The second type of charge is the access fee charged by common carriers for use in carrying long-distance telecommunications via their infrastructure, or toll services. See 47 U.S.C. §§ 201 (requiring common carriers engaged in interstate communication to furnish communication service upon request, to establish physical connections with other carriers, and to establish through routes), 202 (prohibiting discrimination related to the use of common carrier lines of communication). A common carrier must file with the FCC a schedule of all of its charges for interstate wire and radio communication using its network before it may charge its customers for the service. See 47 U.S.C. § 203(a). This schedule is the carrier's federal tariff. Carriers file similar tariffs with the applicable state commission for long-distance charges related to intrastate communications.

This dispute arises from the growing use of wireless telecommunications (commonly referred to as cell phone or mobile phone services). Commercial Mobile Radio Service (CMRS) providers offer radio communication services between land stations and mobile receivers. See 47 C.F.R. § 20.3. Traditional notions of "local exchange areas" do not fit neatly into this new world of wireless communications. For wireless communications, the country is divided into Major Trading Areas (MTAs) rather than local exchange areas. Thus, the local calling area for a cell phone user is determined by the cell phone user's MTA. See 47 C.F.R. § 51.701(b)(2). The MTA for Iowa is the Des Moines MTA, which encompasses virtually all of Iowa and small portions of its neighboring states. IntraMTA traffic originates and terminates within the same MTA, while interMTA traffic originates in one MTA and terminates in another.[2] We are concerned in this case with the charges applicable to intraMTA traffic.

_____

[2]The determination of whether a call is interMTA or intraMTA is made when the call is first connected, although a wireless user may travel into another MTA during the duration of the call.

4

This case involves traffic which occurs when a cell phone user located within the Des Moines MTA initiates a call to a land-line customer of one of the Iowa independent LECs, and the cell phone user's CMRS provider uses Qwest's network to transport the call to INS's network for final termination on the LEC's infrastructure to the called party. Between the 1980s and 1999, Qwest paid INS the access charges established by INS's relevant tariffs for INS's services in transporting the calls that Qwest received from a CMRS provider and handed off to INS for delivery to and termination at an independent ILEC customer via INS's network. Qwest also paid termination fees to the ILEC pursuant to the independent ILECs' tariffs. Three years after passage of the 1996 Act, however, Qwest took the new position that wireless calls originating and terminating within the Des Moines MTA were local rather than long-distance calls, and thus were not subject to the tariffed access charges imposed by either INS or the terminating ILEC. Rather, according to Qwest, INS had to look to the CMRS provider for payment pursuant to a reciprocal compensation arrangement as required by the 1996 Act. See 47 U.S.C. § 251(b)(5).

For its new position, Qwest relied upon an order issued by the FCC. Pursuant to the 1996 Act's requirements, the FCC issued its First Report and Order implementing the Act's local competition provisions. See In re Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Interconnection Between Local Exchange Carriers and Commercial Mobile Radio Service Providers, First Report and Order, 11 FCC Rcd. 15499 (1996) (hereinafter "First Report and Order"). The order was in response to the 1996 Act's direction to the FCC to "'establish regulations to implement the requirements' of § 251, that is, the requirements to advance local competition." GTE South, Inc. v. Morrison, 199 F.3d 733, 737 (4th Cir. 1999) (quoting 47 U.S.C. § 251(d)(1)). The order specifically addressed the billing of calls originated by a wireless provider and delivered to a LEC within the same MTA. First Report and Order at 16013-019, ¶¶ 1035-1045. The FCC decreed that "traffic to or from a CMRS network that originates and terminates within the same MTA is subject to transport and termination rates under section 251(b)(5)

5

[requiring LECs to establish reciprocal compensation arrangements], rather than interstate and intrastate access charges." Id. at ¶ 1036. The FCC also found that "the reciprocal compensation provisions of section 251(b)(5) for transport and termination of traffic do not apply to the transport or termination of interstate or intrastate interexchange traffic." Id. ¶ 1034. "Interexchange traffic" is a term of art which correlates to what consumers would traditionally consider to be "long-distance" telephone service for which "toll charges" are incurred; an interexchange carrier (IXC) is a long-distance carrier who provides intrastate or interstate long-distance communications services between local exchange areas. Qwest argued that paragraph 1036 of the First Report and Order controlled, precluding INS from charging access charges for the relevant traffic. INS countered that paragraph 1034 governed, based on the premises that Qwest is an IXC, the traffic is interexchange traffic, and Qwest was using trunk lines it had designated for long-distance traffic to handle the CMRS originated calls.

Unable to come to an agreement on how to treat the traffic, in September 1999, Qwest stopped paying for access charges billed by INS (dating back to April 1999) that Qwest determined were related to intraMTA wireless-originated calls and sought a declaratory order from the Iowa Utilities Board (IUB or "the Board") that Qwest was not liable for such access charges. The IUB determined that factual disputes and the complexity of the issues regarding the proper treatment of the transported traffic at issue precluded issuance of the requested order and docketed the matter as a contested case, allowing INS to intervene. In the contested case, Qwest, in addition to the declaratory order, sought a refund of access charges it had paid to INS for the 24-month period prior to April 1999. INS in turn sought payment of the access charges Qwest had refused to pay from April 1999 through the time of the hearing.

The IUB held extensive hearings, including technical workshops, to better understand the parties' claims. The presiding officer entered a proposed decision and

order in which she determined that the traffic at issue was local traffic pursuant to the First Report and Order paragraph 1036, and ruled that the access tariffs did not apply. The IUB rejected INS's reliance on paragraph 1034. The IUB determined that the FCC's reference to an IXC was to a traditional IXC that had an established billing relationship with either the originating caller or the end-user, whom the IXC could bill. Because Qwest did not have such a relationship with either the calling or the called parties in the traffic at issue, Qwest was not an IXC. The IUB determined that Qwest provided an indirect connection, not toll services. The presiding officer determined that the CMRS providers and the LECs should negotiate and enter an interconnection agreement, including a reciprocal compensation arrangement, related to the traffic. The presiding officer stated that the parties should operate on a bill-and-keep basis pursuant to regulation, at least until an imbalance could be shown justifying charges for the traffic. "[B]ill-and-keep arrangements are those in which neither of the two interconnecting carriers charges the other for the termination of telecommunications traffic that originates on the other carrier's network," 47 C.F.R. § 51.713(a), and are appropriate when "the amount of telecommunications traffic from one network to the other is roughly balanced with the amount of telecommunications traffic flowing in the opposite direction," id. § 51.713(b).

The presiding officer denied Qwest's request for a refund for the prior 24 months because she found that the parties had agreed to use the rates previously charged by INS, at least until the time that Qwest formally disputed them as of April 1999. She further determined that if the CMRS providers wanted to exchange traffic with the LECs, they should enter an interconnection agreement with the LECs, and that if the CMRS providers wished to use INS's facilities to indirectly connect with the LECs, then INS was entitled to compensation for its indirect transport services and should be included in the negotiations for the agreement. The presiding officer determined that the terms of the interconnection agreement should apply prospectively from April 1999. Thus, while the IUB rejected INS's request for the payment of funds withheld by Qwest since April 1999, it did determine that INS was

entitled to be compensated by the CMRS providers for the transport services Qwest refused to pay since April 1999 at the rate ultimately determined to apply to such traffic going forward.

INS appealed the presiding officer's proposed decision and order to the full Board, which affirmed, making the Board's action final. Instead of appealing the final IUB decision to the Iowa courts, see Iowa Code §§ 476.13, 17A.19, or bringing an action challenging the IUB's decision in federal court pursuant to the Act, INS brought this rather ordinary collection action in federal district court. INS brought claims based on alleged violations of its federal and state tariffs as well as an unjust enrichment claim. INS sought payment of charges billed and allegedly owed under both its federal and state tariffs for the time period beginning in April 1999, or alternatively, damages for the unjust enrichment received by Qwest in using INS's facilities without paying for them. The district court determined that the claims based on INS's tariffs had been decided by the IUB when it decided that the traffic was local and not subject to tariff charges, and consequently were barred by the doctrine of res judicata. It further determined that INS failed to state a claim for unjust enrichment. The district court granted Qwest's motion to dismiss, and INS appeals.

## II. Res Judicata

We begin by focusing on the issue before us. The merits of INS's claims stemming from its tariffs are not before this court. We have before us only the district court's determination that INS's claims are precluded by the IUB's decision. Because the relevant prior judgment was a state of Iowa administrative proceeding, we apply Iowa's res judicata or claim preclusion law. See Canady v. Allstate Ins. Co., 282 F.3d 1005, 1014 (8th Cir. 2002) ("[I]t is fundamental that the res judicata effect of the first forum's judgment is governed by the first forum's law, not by the law of the second forum." (internal quotation marks omitted)). Under Iowa law,

a valid and final judgment on a claim precludes a second action on that claim or any part of it. The rule applies not only as to every matter which was offered and received to sustain or defeat the claim or demand, but also as to any other admissible matter which could have been offered for that purpose.

Arnevik v. Univ. of Minn. Bd. of Regents, 642 N.W.2d 315, 319 (Iowa 2002) (internal citations omitted). Iowa courts look for three factors in applying the defense of claim preclusion: "[1] the parties in the first and second action were the same; [2] the claim in the second suit could have been fully and fairly adjudicated in the prior case; and [3] there was a final judgment on the merits in the first action." Id. (citing 50 C.J.S. Judgment §§ 702, 703 (1997)).

INS argues that the doctrine of claim preclusion does not apply because the first judgment was entered by a state administrative agency and was unreviewed in state court. Iowa courts follow the general rule that gives preclusive effect to adjudications by administrative agencies. See Gardner v. Hartford Ins. Accident & Indem. Co., 659 N.W.2d 198, 207 (Iowa 2003). The Supreme Court of the United States has also allowed unreviewed state administrative decisions to be given preclusive effect, but only when doing so did not contradict congressional intent as to the interplay between federal court jurisdiction and state agency findings. Univ. of Tenn. v. Elliott, 478 U.S. 788, 794-95 (1986) (considering whether preclusive effect should be given to an unreviewed state agency's fact-finding with respect to Title VII case, even though 28 U.S.C. § 1738, requiring federal courts to give full faith and credit to state court judgments, does not apply to unreviewed state administrative findings). In the interpretation of a federal statute, the question of whether a state administrative agency's decision should be given preclusive effect is "not whether administrative estoppel is wise but whether it is intended by the legislature." Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 108 (1991). The Court held that the Age Discrimination in Employment Act's (ADEA) "filing requirements make clear that collateral estoppel is not to apply," id. at 110-11, where

the ADEA requires a petitioner to exhaust state administrative remedies, if available, before seeking redress in federal court, id. at 111 (citing 29 U.S.C. § 633(b)). That scheme "plainly assume[s] the possibility of federal consideration after state agencies have finished theirs." Id.

The Court began with the premise that "where a common-law principle is well established, as are the rules of preclusion, the courts may take it as given that Congress has legislated with an expectation that the principle will apply except when a statutory purpose to the contrary is evident." Id. at 108 (internal quotation marks and citations omitted). Stated another way, "common law doctrines [of res judicata and issue preclusion] . . . are trumped by the Supremacy Clause if the effect of the state court judgment or decree [or administrative ruling] is to restrain the exercise of the United States' sovereign power by imposing requirements that are contrary to important and established federal policy." Arapahoe County Pub. Airport Auth. v. FAA, 242 F.3d 1213, 1219 (10th Cir.) (holding that FAA was not precluded from reviewing ban imposed by airport authority for compliance with federal law even though state supreme court had previously upheld ban, where federal concerns were clearly preeminent in field of aviation regulation), cert. denied, 534 U.S. 1064 (2001). Thus, the Astoria rule prevents application of res judicata in this case if Congress so intended within the context of the Telecommunications Act of 1996, 47 U.S.C. §§ 151-615b.

Our review of the 1996 Act convinces us that Congress intended to supplant the common law principles of claim preclusion when it enacted the 1996 Act, at least with respect to the issues here involved. It is worth repeating that the issue determined by the IUB was that the intraMTA traffic between the CMRS providers and wireline ILECs, using Qwest's and INS's transmission facilities, involved local traffic rather than long-distance toll service, and as such, reciprocal compensation under § 251(b)(5) rather than tariffed access charges applied to the traffic.

There can be no doubt that in the 1996 Act Congress greatly expanded the federal government's involvement in the telecommunications industry, even into areas such as local exchange service that previously had been left to state regulation. "Through the Telecommunications Act of 1996 Congress has opened the door to competing local exchange carriers and has inserted both the Federal Communications Commission (FCC) and the federal courts into the previously state-regulated monopoly." Ill. Bell Tel. Co. v. Worldcom Techs., Inc., 179 F.3d 566, 568 (7th Cir. 1999) (holding that § 252(e)(6) gave the federal court jurisdiction to review whether a state agency determination–that the parties' interconnection agreement intended to subject calls placed to internet service providers to reciprocal compensation–violated federal law), cert. dismissed, 535 U.S. 682, and cert. denied, 535 U.S. 1107 (2002); see also AT&T Corp. v. Iowa Until. Bd., 525 U.S. 366, 381 n.8 (1999) ("Congress, by extending the Communications Act into local competition, has removed a significant area from the States' exclusive control.").

Congress was well aware of the existing jurisdictional authority split between the federal government and state governments concerning various aspects of the telecommunications industry when it drafted the 1996 Act. For instance, the 1996 Act specifically retains a state commission's jurisdiction over local exchange service, even if a portion of that service includes interstate communication. See § 221(b) ("[N]othing in this chapter shall be construed to apply, or to give the Commission jurisdiction, with respect to charges, classifications, practices, services, facilities, or regulations for or in connection with wire, mobile, or point-to-point radio telephone exchange service . . . in any case where such matters are subject to regulation by a State commission . . . ."). However, Congress expressly exempted the states' authority concerning local exchange service with respect to mobile services: "[n]otwithstanding . . . § 221(b) of this title, no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service . . . ." § 332(c)(3)(A).

In addition, Congress specifically delegated to federal district courts the task of reviewing state agency determinations made pursuant to § 252. See § 252(e)(6). The scheme developed by the 1996 Act requires all ILECs to interconnect with a requesting telecommunications carrier for the transmission of telephone exchange service and to enter an interconnection agreement, including the establishment of reciprocal compensation arrangements for the transport and termination of communications. See § 251(b)-(c). Section 252 deals with the formation of the interconnection agreements, which may be reached by negotiation or arbitration. See § 252(a)-(b). Once reached, interconnection agreements must be approved by the relevant state commission. § 252(e)(1). If the state commission fails to act on the agreement, either approving or rejecting it, the FCC "shall assume the responsibility of the State commission." § 252(e)(5). If the state commission acts either to approve or reject an agreement, the aggrieved party may bring an action in an appropriate federal district court. § 251(e)(6). We have previously construed this provision to allow a federal district court to review a state commission's interpretation of an interconnection agreement, in addition to reviewing a state commission's approval or rejection of an agreement. See Southwestern Bell Tel. Co. v. Connect Commun. Corp., 225 F.3d 942 (8th Cir. 2000). The Supreme Court declined to reach the issue of whether § 252(e)(6) specifically grants federal courts jurisdiction to review a state commission's interpretation of interconnection agreements, but held that in no event did the provision divest federal courts of their jurisdiction under the general federal question statute. See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 643-44 (2002) (federal courts have jurisdiction under 28 U.S.C. § 1331 to review claim that state commission violated federal law in determining that interconnection agreement included calls placed to ISP providers as local calls subject to reciprocal arrangement, refusing to address issue of whether 47 U.S.C. § 251(e)(6) separately gave federal courts power to review state commissions' interpretation of interconnection agreement).

12

The IUB decision here did not involve the approval, rejection, or even the interpretation of an interconnection agreement; none exists. Rather, it involved the IUB's determination that the traffic at issue–intraMTA traffic–is local traffic subject to a reciprocal compensation arrangement rather than toll service subject to access charges. The IUB recommended that the CMRS providers and the LECs enter an interconnection agreement, which agreement was to be premised on the IUB's determination that the traffic at issue was subject to reciprocal compensation. It further stated that if the CMRS providers intended to connect indirectly with the LECs through Qwest or INS, then they had to include those parties in the agreement. As to the parties to the interconnection agreement, assuming one is ever reached, the IUB's determination that the traffic at issue is subject to reciprocal compensation will eventually be reviewable within the context of any federal court § 252(e)(6) proceedings that may be instituted.

But the lack of an interconnection agreement reviewable pursuant to the federal courts' exclusive jurisdiction established by § 252(e)(6) does not give the IUB's determination in this case preclusive effect. To the contrary, consider the scenario that will exist if the CMRS providers do enter interconnection agreements with the independent LECs and include INS in the negotiations and agreement. Once the agreement is either approved or rejected by the IUB, any aggrieved party is directed by Congress to bring an action in federal court to challenge the IUB's determination that the agreement is, or is not, in compliance with §§ 251 and 252. Where does the IUB's original determination, at issue here, then come into play? Can it bind the federal district court's reviewing hands? It certainly should not have preclusive effect in that scenario, and we cannot see how it can have preclusive effect in the present litigation.

Federal courts have the ultimate power to interpret provisions of the 1996 Act, including whether § 251(b)(5)'s reciprocal compensation requirement applies to the wireless traffic at issue here, even though this case is not brought within the context

13

of a § 252(e)(6) proceeding.  See GTE North, Inc. v. Strand, 209 F.3d 909, 916-17 (6th Cir.), cert. denied, 531 U.S. 957 (2000).  In GTE North, during the pendency of a § 252(b) arbitration proceeding involving GTE as the ILEC, the Michigan Public Service Commission initiated state administrative proceedings against GTE and other ILECs to establish general terms of interconnection.  Within that administrative proceeding, the state commission ordered GTE to publish tariffs in which GTE would offer to sell its network elements at rates predetermined by the state commission. GTE appealed that order, which was affirmed by the Michigan Court of Appeals. GTE then sued the state commission in federal court, alleging that the state commission violated federal law in ordering GTE to publish the tariff.  The district court dismissed for lack of jurisdiction, finding that § 252(e)(6) precluded federal review until the state commission made a determination either approving or rejecting an interconnection agreement pursuant to § 252.  The Sixth Circuit reversed, holding that the district court had jurisdiction under 28 U.S.C. § 1331 to review the state commission's order that was not part of a 47 U.S.C. § 252 interconnection proceeding.  Id. at 915-16.  To preclude federal court review of a non-§ 252 order on the basis that the order would eventually make its way into a reviewable interconnection agreement would circumvent Congress's decision to establish federal procedures for negotiating interconnection rights and to concentrate final judicial review of interconnection agreements in federal courts. Id. at 918.  The court held "that federal review is available under § 1331 to determine whether state commission orders violate federal law except in cases in which the challenged regulatory action is clearly an interlocutory order arising out of § 252 proceedings."  Id. at 919.

Here, the IUB was indisputably interpreting federal law.  As noted by the Supreme Court,"there is no doubt . . . that if the federal courts believe a state commission is not regulating in accordance with federal policy they may bring it to heel."  AT&T Corp., 525 U.S. at 378 n.6.  Given this regulatory landscape, we hold that the district court erred in giving preclusive effect to the IUB's determination that

the traffic at issue here was subject to reciprocal compensation pursuant to §251(b)(5).

The IUB proceedings involved more parties than are involved in this litigation. As stated above, Qwest filed a declaratory action, which the IUB converted into a contested case. Parties intervening in the contested case included INS, the Iowa Telecommunications Association (ITA), the Rural Iowa Independent Telephone Association (RIITA), four wireless providers, and two independent local exchange carriers. Following the IUB's decision, RIITA, an association of independent rural telephone companies, brought a federal action challenging the IUB's order that its members, the ILECs, were required to enter interconnection agreements with the CMRS providers and apply reciprocal compensation arrangements to the intraMTA traffic at issue. RIITA named the IUB and the individual board members as defendants in its federal district court case. Qwest was allowed to intervene in support of the IUB's decision. The district court dismissed the case for lack of jurisdiction under the Hobbs Act, 28 U.S.C. § 2342(1), finding that RIITA's challenge was really to the final order entered by the FCC, and as such, original jurisdiction belonged in the United States Court of Appeals. In our companion case, Rural Iowa Indep. Tel. Ass'n v. Iowa Utils. Bd., No. 02-4060, 2004 WL 635523 (8th Cir. Apr. 1, 2004), we reversed the district court and remanded the case back to the district court to decide the remaining issues. We held that RIITA's federal action did not in fact challenge the FCC's order, but rather the IUB's interpretation of it. Id. at *2.

The inconsistency that would result if we allowed the IUB's decision to have preclusive effect in this case while we remand the companion case for further consideration by the district court reinforces our decision that the IUB's decision should not be given preclusive effect in this case. Granted, the parties did not argue that the IUB's decision should be granted preclusive effect in the companion case, but the argument Qwest did make is equally telling. Qwest strenuously argued that the IUB's interpretation was governed, in fact controlled, by 47 U.S.C. § 251(b)(5) and

the FCC's implementing regulations. (Qwest Br. at 26.) Congress gave the authority to interpret § 251(b)(5) to the federal courts. To hold that the district court was bound by the IUB's determination in this case, but allow the district court in the companion case to reach the federal issues, could result in an inconsistency we cannot condone.

We point out that our holding is narrow–it is limited to the district court's decision that it was bound by the IUB's determination on principles of res judicata. That is not to say that we think the IUB erred in interpreting federal law; we express no opinion there. Rather, we remand the case to the district court for further proceedings, as that court is best poised for evaluating the parties' remaining arguments.

## III. Unjust Enrichment

The district court granted Qwest's motion to dismiss INS's unjust enrichment claim for failure to state a claim.

> We review de novo a district court's grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6). A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. A complaint must be viewed in the light most favorable to the plaintiff and should not be dismissed merely because the court doubts that a plaintiff will be able to prove all of the necessary factual allegations.

Krentz v. Robertson, 228 F.3d 897, 905 (8th Cir. 2000) (internal citations and quotation marks omitted).

The district court found, as a matter of law, that Qwest was not a beneficiary of INS's services because the traffic that passed along INS's network belonged to the wireless providers, not to Qwest. The district court based its conclusion on the IUB's

16

determination that the traffic at issue was local and as such was not subject to access charges. (Add. at 33.) The district court determined that the only beneficiaries of INS's network were the CMRS providers and their customers who made the calls, and the ILECs and their customers who received the calls. (Add. at 35.)[3]

Unjust enrichment is an equitable doctrine of restitution, wherein a plaintiff "must prove the defendant received a benefit that in equity belongs to the plaintiff." Slade v. M.L.E. Inv. Co., 566 N.W.2d 503, 506 (Iowa 1997). The doctrine is based on the concept of an implied contract. However, "[a]n express contract and an implied contract cannot coexist with respect to the same subject matter," and Iowa courts refuse to imply a contract where an express contract exists. Chariton Feed & Grain, Inc. v. Harder, 369 N.W.2d 777, 791 (Iowa 1985) (rejecting claim for unjust enrichment where the controversy was covered by an express contract). Thus, to the extent that the basis for INS's claim of unjust enrichment is covered by an express contract, either in the form of a tariff or a reciprocal compensation arrangement, INS cannot state a claim for unjust enrichment under Iowa law.

As stated above, we are remanding this case to the district court to decide for itself whether the traffic at issue is subject to access charges pursuant to INS's tariffs. We likewise reverse and remand the district court's judgment dismissing the unjust enrichment claim and leave the issue open on remand, as the proper treatment of the claim depends on the disposition of INS's other claims.

---

[3]We respectfully believe that the district court misstated the law in stating that as an ILEC, Qwest was obligated to carry the CMRS traffic if requested to do so. (Add. at 32.) An ILEC is an incumbent local exchange carrier. Although Qwest serves as a LEC in certain communities to the extent it provides local telephone service, and may even be an ILEC, a fact not developed on the record, it served neither function with respect to the traffic here at issue. The CMRS traffic was not directed to any of Qwest's local telephone customers; rather, Qwest served merely as an intermediary carrying the traffic on its route to INS's member companies' local telephone customers.

## IV.

We reverse the district court's judgment and remand for further proceedings not inconsistent with this opinion.

_____