# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-3551

_____

Iowa Network Services, Inc.,   *
                               *
            Appellant,         *
                               *   Appeal from the United States
    v.                         *   District Court for the
                               *   Southern District of Iowa.
Qwest Corporation,             *
                               *
            Appellee.          *

_____

Submitted: May 15, 2006
Filed: October 31, 2006

_____

Before BYE, HANSEN, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Iowa Network Services, Inc. ("INS") brought this collection action against Qwest Corporation ("Qwest"), alleging violations of its federal and state tariffs, as well as unjust enrichment, for services provided in connecting wireless calls to rural Iowa telephone companies. The district court granted Qwest's motion to dismiss. INS appealed, and we reversed the district court's judgment and remanded for further proceedings. *Iowa Network Serv., Inc. v. Qwest Corp.*, 363 F.3d 683 (8th Cir. 2004) ("*Qwest I*"). On remand, Qwest filed a motion for summary judgment. As outlined in

its thorough opinion, the district court[1] granted Qwest's motion for summary judgment on all claims and dismissed the case. INS now appeals from the district court's grant of summary judgment to Qwest, arguing principally that the district court should have applied the filed rate doctrine. We affirm.

## I. *Background*

The background facts underlying this dispute are fully set forth in our prior opinion, *Qwest I*, and the district court's summary judgment opinion, *Iowa Network Serv., Inc. v. Qwest Corp.*, 385 F. Supp. 2d 850 (S.D. Iowa 2005) ("*Qwest II*"). We instructed the district court on remand "to decide for itself whether the traffic at issue is subject to access charges pursuant to INS's tariffs." *Qwest I*, 363 F.3d at 695.

Upon remand, the district court, in granting Qwest's motion for summary judgment and dismissing INS's claims, made several important findings. First, with respect to the Iowa Utilities Board ("IUB"), the district court determined that (1) the IUB had jurisdiction to rule in the underlying action and was acting within its authority in rendering its rulings; (2) the IUB's rulings are consistent with, and do not violate, federal law; and (3) the IUB's orders must be upheld as a regulatory means of resolving the dispute.

Second, the district court found that (1) INS's amended federal tariff does not apply to the traffic at issue, as it undermines the thrust of the Telecommunications Act of 1996 ("the Act") and the authority of the IUB; (2) the Iowa tariff and the original federal tariff are inapplicable under the terms of the Act and the IUB's rulings; and (3) these determinations foreclose INS's self-help claims.

---

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

Lastly, the district court held that (1) equitable remedies are not available to INS; (2) a regulatory scheme is available to the parties as indicated by the IUB's decisions, and the parties must adhere to this framework before equitable remedies may be ripe for consideration; and (3) INS's unjust enrichment and implied contract/quantum meruit claims fail on the current record because of assorted substantive deficiencies.

INS appeals, seeking reversal of the district court's summary judgment ruling and enforcement of INS's tariffs pursuant to the filed rate doctrine, as codified in state and federal statutes.

## II. *Discussion*

### A. *Standard of Review*

We review de novo a district court decision granting a motion for summary judgment, using the same standard as the district court and construing the record in the light most favorable to [ ] the nonmoving party. Summary judgment is appropriate only if the evidence establishes that there exists no genuine issue of material fact and that the moving party [ ] is entitled to judgment as a matter of law.

*Johnson v. AT&T Corp.*, 422 F.3d 756, 760 (8th Cir. 2005) (internal citation omitted). "Federal courts have the ultimate power to interpret provisions of the 1996 Act, including whether § 251(b)(5)'s reciprocal compensation requirement applies to the wireless traffic at issue here . . . ." *Qwest I*, 363 F.3d at 692; 47 U.S.C. § 252(e)(6).

### B. *Enforcement of INS's Federal and State Tariffs*

INS argues on appeal, inter alia, that the district court erred in failing to apply the filed rate doctrine and allowing the IUB to displace the tariffs at issue. INS states that telecommunications tariffs have the effect of law and conclusively establish the terms under which a carrier must charge and the user must pay for telecommunications services covered by the tariff. INS claims that it was error for the

district court to yield to the IUB ruling and refuse to enforce, and effectively invalidate, INS's tariffs. Further, INS contends that the district court erred in finding that INS's amended tariff was an effort to circumvent the negotiation/arbitration process codified in 47 U.S.C. § 252. INS asserts that even though the negotiation/arbitration process applies only to incumbent local exchange carriers ("ILECs"), and INS, Qwest, and the third-party wireless carriers cannot properly be considered ILECs, the district court held that the IUB was authorized to impose the negotiation/arbitration process on broader categories of carriers. INS states that this holding was erroneous because (1) this court has already held that the district court was not bound by the IUB's findings and (2) the IUB did not invoke any residual state law authority to find that INS could be properly required to undertake the negotiation/arbitration process. Next, INS states that the district court erred in relying on the Federal Communications Commission's (FCC) reciprocal compensation rules to support its refusal to enforce INS's tariffs. Lastly, INS asserts that, in the event this court upholds the district court's decision to dismiss INS's claims regarding the violation of its tariffs, this court should remand this case to allow INS to proceed on its state law claims of unjust enrichment and implied contract.

INS's tariffs purportedly require Qwest to compensate INS for all traffic, regardless of origin, that Qwest transports to INS for completion over INS's access service trunks, including intrastate traffic. In this appeal, INS asserts that the FCC has exclusive jurisdiction over any claims regarding INS's federal tariff. In addition, INS states that the district court misconstrued the FCC's reciprocal compensation rules as barring enforcement of INS's state tariff. INS contends that the reciprocal compensation rules do not apply here because INS and Qwest are intermediary carriers. INS submits that reciprocal compensation rules more aptly apply to those carriers that originate and terminate the telephone calls. Because intermediary carriers, like Qwest and INS, by definition, neither originate nor terminate calls, they do not fit into the "reciprocal" relationship contemplated in the Act and defined in the FCC's rules. Consequently, INS submits that the FCC's rules permit an intermediary carrier

like INS to charge another intermediary carrier like Qwest, rather than the originating carrier.

INS urges that § 251 imposes on ILECs, but not other carriers, the duty to negotiate an interconnection agreement in response to such a demand and to participate in arbitration if negotiations fail. INS states that neither it nor Qwest are ILECs for purposes of this case, meaning § 251 does not apply. Also, INS submits that the proper procedure for seeking to invalidate its tariffs is to file a complaint with the FCC because, under the filed rate doctrine, only the FCC can invalidate the tariff. Absent such action, INS states that the tariff governs the charges until the day the FCC requires changes or cancels the tariff.

Qwest responds by stating that the 1996 Act intended for state commissions, such as the IUB, to resolve open issues in telecommunications and that is exactly what happened in this case. Qwest urges that the IUB acted within its authority, and its decision does not violate federal law. As a result, the district court did not err in granting summary judgment based upon the IUB's ruling. Qwest further states that the filed rate doctrine, established by 47 U.S.C. § 203, is limited to "interstate and foreign" traffic. Because the communications that are the subject of INS's complaint are "intrastate," not "foreign or interstate," § 203 does not apply and hence the filed rate doctrine does not apply.

The district court found that the Act and the FCC's interpretive and implementing decisions have eliminated access charges, or tariffs such as INS seeks to impose, for local traffic. Thus, the district court held that the IUB's determination—that Qwest need not pay access charges because access charges are not available for "local" traffic—was consistent with federal law. Moreover, the district court found that because the FCC's reciprocal compensation rules do not directly address the intermediary carrier compensation to be paid, the IUB is

authorized to resolve the question, as long as its resolution does not violate federal law. We agree.

As stated in *Qwest I*, "there are two types of charges which one carrier can extract from another for the provision of telecommunication services." 363 F.3d at 686. For *local* telephone service, "[u]nder the 1996 Act, the amount an ILEC can charge for allowing a competitor to use its infrastructure to deliver a local call is to be determined by an interconnection agreement negotiated . . . between the ILEC and the interconnecting carrier that has been approved by the state commission." *Id*. (citing 47 U.S.C. § 251(c)(1)). The access fee, or carrier's tariff, is charged "by common carriers for use in carrying *long-distance communications* via their infrastructure, or toll services." *Id*. (citing 47 U.S.C. §§ 201, 202) (emphasis added).

Because this case concerns intraMTA [major trading area] traffic, which originates and terminates within the local calling area for cell phone users, we agree with the district court that this case involves local traffic, or *intrastate* telephone calls, and the manner of calculating the charges for connecting those calls between interconnecting carriers or transferring carriers. The IUB and the district court, guided by the orders and regulations of the FCC, determined that because the traffic at issue here is local, or *intrastate*, access fees or tariffs do not apply. When dealing with this type of traffic, the district court and IUB determined that reciprocal compensation agreements control and that the parties should negotiate or arbitrate—not unilaterally file tariffs.

The FCC differentiates between transport and termination of local traffic and access service for long-distance telecommunications.

> Transport and termination of local traffic for purposes of reciprocal compensation are governed by sections 251(b)(5) and 252(d)(2), while access charges for interstate long-distance traffic are governed by sections 201 and 202 of the Act. . . . We conclude that section 251(b)(5)

reciprocal compensation obligations should apply only to traffic that originates and terminates within a local area.

*In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd. 15499, ¶¶ 1033–34, 1996 WL 452885 (1996). Moreover, the FCC has ruled that

traffic to or from a CMRS [commercial mobile radio service] network that originates and terminates within the same MTA is subject to transport and termination rates under section 251(b)(5), rather than interstate and intrastate access charges. We conclude that section 251(b)(5) obligations apply to all LECs [local exchange carriers] in the same state-defined local exchange service areas . . .

*Id*. at ¶¶ 1036–37. Lastly, the FCC has stated that

[a]lthough section 252(b)(5) does not explicitly state to whom the LEC's obligation runs, we find that LECs have a duty to establish reciprocal compensation arrangements with respect to local traffic originated by or terminating to any telecommunications carriers . . . LECs' reciprocal compensation obligations under section 251(b)(5) apply to all local traffic transmitted between LECs and CMRS providers.

*Id*. at ¶ 1041.

In this case, the calls originate and terminate within the same local MTA; therefore, they are considered to be "local" calls. According to the FCC's ruling, because these calls are "local," they are to be governed by reciprocal compensation arrangements. The rulings of the district court and the IUB are consistent with this ruling; thus, they do not violate federal law. As a result, the district court did not err in granting Qwest's motion for summary judgment.

The IUB found that the tariffs at issue in this case did not apply to the type of traffic involved in this dispute, namely local traffic. Consequently, neither the district court nor the IUB followed the filed rate doctrine. "Under [the filed rate] doctrine, once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer." *Evanns v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000). INS repeatedly argues that the actions of the district court and the IUB nullify its federal tariffs. We disagree with INS's characterization. The IUB did not invalidate INS's tariffs; it simply stated that the charges as set out in INS's tariffs do not apply to the type of traffic at issue in this case. This determination does not mean that the tariff does not apply to interstate or foreign traffic. The tariff is still enforceable for traffic as specified in 47 U.S.C. §§ 202, 203. Because the traffic in this case is "local," and therefore covered by 47 U.S.C. §§ 251, 252, INS's tariff is not applicable.

In the absence of a clear mandate from the FCC or Congress stating how charges for this type of traffic should be determined, or what type of arrangement between carriers should exist, the Act has left it to the state commissions to make the decision, as long as it does not violate federal law and until the FCC rules otherwise.

> The goal of preserving a role for the state regulatory commissions is reflected in a number of provisions in the [1996 Act]. Congress expressly left with the states the power to enforce 'any regulation, order, or policy of a State commission that . . . establishes access and interconnection obligations of local exchange carriers; . . . is consistent with the requirements of this section; and . . . does not substantially prevent implementation of the requirements of this section and the purposes of this part.'

*Global Naps, Inc. v. Mass. Dep't of Telecomm. & Energy*, 427 F.3d 34, 46–47 (1st Cir. 2005) (quoting 47 U.S.C. § 251(d)(3)). As the IUB acted within its power under statute, we find no error.

Next, we examine the district court's finding that reciprocal compensation applies to arrangements between INS and Qwest. In *Illinois Bell Telephone Co. v. WorldCom Tech, Inc.*, 179 F.3d 566 (7th Cir. 1999), the court held that just because "the Act does not *require* reciprocal compensation for calls to ISPs [Internet service providers] is not to say that it *prohibits* it. The Act simply sets out the obligations of all local exchange carriers to provide for reciprocal compensation . . . ." *Id.* at 573 (emphasis in original). The court found that "[t]he ICC's conclusion—that reciprocal compensation should apply to traffic Ameritech bills as local traffic—does not violate the Act or the FCC's interpretation of the Act." *Id*. We reach the same conclusion in this case. The fact that reciprocal compensation is only explicitly provided for with respect to ILECs does not mean that the Act prohibits reciprocal compensation arrangements for LECs. In fact, the FCC stated that "LECs have a duty to establish reciprocal compensation arrangement with respect to local traffic originated by or terminating to any telecommunications carriers." *Local Competition Provisions*, 11 FCC Rcd. 15499 at ¶ 1041. Therefore, because there is no prohibition from Congress or the FCC, we hold that the IUB was within its jurisdiction to rule as it did.

Lastly, we note the FCC's stated desire to move away from tariffs and toward negotiation and arbitration in order to facilitate market competition. *See In the Matter of Developing a Unified Intercarrier Compensation Regime T-Mobile et al.*, 20 FCC Rcd. 4855, 2005 WL 433200 (2005) (holding that the FCC is amending its rules to make clear its preference for contractual arrangements by prohibiting LECs from imposing compensation obligations for non-access CMRS traffic pursuant to tariff.); *MCI WorldCom, Inc. v. Fed. Comm. Comm'n*, 209 F.3d 760 (D.C. Cir. 2000) (stating that the Commissioner tentatively concluded that tariffing was no longer necessary). "The Commission has long been concerned that the necessity of filing tariffs hinders

competitive responsiveness . . . [and] the filed-rate doctrine has been used by the carriers as a shield to avoid individual contract negotiations with large and small users, thereby reducing competition among carriers." *MCI WorldCom*, 209 F.3d at 764. Moreover, as pointed out by the FCC, "no provision of the Communications Act except §203(a) requires tariffing, and no provision gives a carrier a positive right to file a tariff, so if it forbears from applying § 203(a) the Commission's staff is not obliged to accept filings."

## C. *Implied Contract and Unjust Enrichment*

INS appeals the district court's dismissal of its state law claims of unjust enrichment and implied contract (quantum meruit). However, INS concedes that it cannot prevail on these claims if they are covered by an express contract, either in the form of a tariff or a reciprocal compensation agreement. Because we have already concluded that the IUB acted within its authority in directing INS and Qwest to negotiate within the reciprocal compensation regime, the regulatory process contemplates that an express contract will ultimately result, and for this reason the district court did not err in dismissing INS's state law claims of unjust enrichment and implied contract.

## III. *Conclusion*

For these reasons, we affirm the district court's grant of summary judgment, based upon the IUB's determinations, because its rulings are not contrary to federal law.

_____