**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 18-10768

United States Court of Appeals
Fifth Circuit

**FILED**
May 27, 2020

Lyle W. Cayce
Clerk

IN RE: INTRAMTA SWITCHED ACCESS CHARGES LITIGATION

consolidated with
Nos. 18-10770, 18-10772, 18-10774, 18-10776, 18-10778, 18-10779, 18-10781, 18-10787, 18-10788, 18-10790, 18-10791, 18-10792, 18-10794, 18-10796, 18-10797, 18-10798, 18-10799, 18-10800, 18-10802, 18-10803, 18-10804, 18-10805, 18-10806, 18-10808, 18-10810, 18-10812, 18-10813, 18-10814, 18-10815, 18-10816, 18-10817, 18-10818, 18-10819, 18-10820, 18-10821, 18-10822, 18-10823, 18-10824, 18-10826, 18-10827, 18-10828, 18-10829, 18-10830, 18-10831, 18-10832, 18-10833, 18-10834, 18-10835, 18-10836, 18-10838, 18-10839, 18-10840, 18-10841, 18-10842, 18-10843, 18-10844, 18-10845, 18-10846, 18-10847, 18-10848, 18-10849, 18-10850, 18-10855, 18-10901, 18-10902, 18-10903, 18-10904, 18-10905, 18-10906, 18-10907, 18-10908, 18-10909, 18-10910, 18-10911, 18-10962, 18-10964, 18-11094, 18-11095 and 19-10135.

Appeals from the United States District Court
for the Northern District of Texas

Before JOLLY, SMITH, and STEWART, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

In this multidistrict litigation case, interexchange carriers ("IXCs") Sprint Communications Company L.P. ("Sprint") and MCI Communications

No. 18-10768

Services, Inc. / Verizon Select Services Inc. ("Verizon") sued hundreds of local exchange carriers ("LECs") in courts throughout the United States. Each case presents the following question: Can LECs assess IXCs access charges[1] when LECs provide IXCs with services that enable the IXCs to exchange wireless-to-wireline[2] calls that originate and terminate within the same Major Trading Area ("MTA")?

Answering in the affirmative, the district court (1) dismissed Sprint and Verizon's claims against the LECs and (2) granted summary judgment to the LECs on their claims against Sprint, Verizon, and Level 3 Communications Co. ("Level 3"). We affirm in major part, vacate in minor part, and remand.

I.

The facts aren't in dispute. Instead, this appeal centers on their legal consequences under the somewhat convoluted federal regulatory framework.

A.

Three types of "carriers" provide telephone service: (1) LECs, (2) IXCs, and (3) commercial mobile radio service ("CMRS") providers. LECs provide wireline service within "a given geographical calling area"—called an "exchange area"—via networks of wires and switching equipment. *Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 617 (5th Cir. 2000). IXCs provide service "connecting callers served by different LEC[s]" or connecting CMRS providers and LECs that don't directly interconnect. *Id.* CMRS providers furnish

---

[1] Sprint and Verizon's complaints refer to these fees as "switched access charges," but they generally omit "switched" in their briefs. For convenience, we also omit "switched" and use the term "access charges."

[2] "Wireless-to-wireline" refers to calls originated by CMRS providers and terminated by LECs and vice versa. Wireline service is also called landline service.

No. 18-10768

wireless service, which enables end-users[3] to call both cellular and wireline phones.

Both LECs and CMRS providers can "originate" (*i.e.*, initiate a call placed by an end-user) and "terminate" (*i.e.*, deliver a call to the called end-user) telecommunications traffic. IXCs, on the other hand, don't directly connect to end-users; they only carry traffic that was originated by either a LEC or a CMRS provider.[4] Because each type of carrier connects directly with only one (if any) type of customer, the carriers must cooperate to exchange telecommunications traffic.

"Intercarrier compensation comes into play whenever two or more carriers collaborate to complete a phone call." *Glob. Naps, Inc. v. Verizon New Eng., Inc.*, 444 F.3d 59, 63 (1st Cir. 2006). Carriers generally compensate each other in two ways: "(1) access charges; and (2) reciprocal compensation." *In re Connect Am. Fund*, 26 F.C.C. Rcd. 4554, 4707 ¶ 502 (2011). What sort of compensation may be assessed, and by whom, "depend[s] on a number of factors," such as "where the call begins and ends," "what types of carriers are involved," and "the type of traffic" exchanged. *Id.*

LECs impose access charges on other carriers—most commonly IXCs—for the right to access their networks and switching equipment. *See Alenco*, 201 F.3d at 618. LECs provide those access services using Feature Group D ("FGD") trunks,[5] which Sprint and Verizon utilized to connect and carry the

---

[3] End-user is defined, in relevant part, as "any customer of an interstate or foreign telecommunications service that is not a carrier . . . ." 47 C.F.R. § 69.2(m) (2019).

[4] *See Peerless Network, Inc. v. MCI Commc'ns Servs., Inc.*, 917 F.3d 538, 541 (7th Cir. 2019) (noting that IXCs connect to LECs, who, in turn, connect to end-users).

[5] *See Cent. Tel. Co. of Va. v. Sprint Commc'ns Co. of Va.*, 715 F.3d 501, 507 (4th Cir. 2013) (explaining what FGD trunks are); *see also In re Petition for Declaratory Ruling that AT&T's Phone-to-Phone IP Telephony Servs. Are Exempt from Access Charges*, 19 F.C.C. Rcd. 7457, 7464 ¶ 11 n.46 (2004) ("[FGD] trunks allow end users to use 1+ dialing for long-distance

traffic at issue.  Carriers can procure those services "in one of two ways: (1) by 'affirmatively' ordering . . . or (2) by constructively ordering" them.[6]  Access charges are set by tariffs filed with the FCC and state agencies,[7] both of which actively regulate the rates that LECs can charge.[8]  Historically, "access charges [we]re set relatively high in order to cover certain loop costs not recovered through local rates." *In re Fed.-State Joint Bd. on Universal Serv.*, 12 F.C.C. Rcd. 8776, 8784 ¶ 11 (1997).

Reciprocal compensation, one the other hand, was first introduced by the Telecommunications Act of 1996, Pub. L. No. 104–104, 110 Stat. 56 (codified, as amended, in scattered sections of title 47, U.S. Code) (the "1996 Act").  That compensation framework is "best understood as an 'originator pays' rule": "[W]hen a customer of Carrier A places a local call to a customer of Carrier B, Carrier A must pay Carrier B for terminating the call, and vice versa." *AT&T Corp. v. Core Commc'ns, Inc.*, 806 F.3d 715, 719 (3d Cir. 2015).  Reciprocal compensation rates are set by state-approved "interconnection agreements," which are the product of either "voluntary negotiation or compulsory arbitration." *Sw. Bell Tel. Co. v. Pub. Util. Comm'n of Tex.*, 208 F.3d 475, 479 (5th

---

calls, with the call being handled by the caller's preselected [IXC].").

[6] *Am. Tel. & Tel. Co. v. City of New York*, 83 F.3d 549, 553 (2d Cir. 1996).  Affirmative ordering entails placing an order consistent with the process outlined in the LECs' tariffs. By contrast, constructive ordering occurs when a customer "fail[s] to take steps to control unauthorized" use of the tariffed services, thereby creating "an inadvertent carrier-customer relationship." *United Artists Payphone Corp. v. N.Y. Tel. Co.*, 8 F.C.C. Rcd. 5563, 5566 ¶ 13 (1993); *see also Sw. Bell Tel. Co. v. V247 Telecom LLC*, 207 F. Supp. 3d 688, 699 (N.D. Tex. 2016) (applying that doctrine in access charge dispute); *All. Commc'ns Coop., Inc. v. Glob. Crossing Telecomms., Inc.*, 663 F. Supp. 2d 807, 821 (D.S.D. 2009) (same).

[7] *See Union Tel. Co. v. Qwest Corp.*, 495 F.3d 1187, 1191 (10th Cir. 2007).

[8] *See, e.g.*, *Tex. Office of Pub. Util. Counsel v. FCC*, 265 F.3d 313, 318–19 (5th Cir. 2001) (discussing numerous regulatory actions taken by the FCC related to access charges); *Alenco*, 201 F.3d at 618 (noting that the FCC and state regulators have developed several "cost separation rules" to "implement rate-of-return regulation").

No. 18-10768

Cir. 2000). Unlike access charges, reciprocal compensation is "based solely on the costs of transport and termination incurred by the terminating provider." *Atlas Tel. Co. v. Okla. Corp. Comm'n*, 400 F.3d 1256, 1261 (10th Cir. 2005).

The FCC and state regulators have painted with a broad brush, establishing a "bifurcated local/long-distance system for" sharing compensation between and among carriers. *Alma Commc'ns Co. v. Mo. Pub. Serv. Comm'n*, 490 F.3d 619, 620 (8th Cir. 2007). Generally, reciprocal compensation applies to "local" traffic, whereas access charges apply to "long-distance" traffic. *See id.* at 621. That legal framework applies straightforwardly for wireline-to-wireline calls, but it's more complex for wireless-to-wireline calls.

For wireline-to-wireline, state regulators enjoy the power "to determine what geographic areas should be considered 'local areas' . . . ." *In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996* (*Local Competition Order*), 11 F.C.C. Rcd. 15499, 16013 ¶ 1035 (1996). States generally have defined "local areas" in terms of "exchange areas," which are relatively small geographically and often comprise "a city and its environs." *Sw. Bell Tel. Co. v. Pub. Util. Comm'n of Tex.*, 348 F.3d 482, 485 n.4 (5th Cir. 2003).

Wireline-to-wireline calls exchanged between end-users within the same exchange area ("intraexchange") are considered local, while calls exchanged between end-users in different exchange areas ("interexchange") are long-distance. Intraexchange calls involve, at most, two carriers: the originating LEC and the terminating LEC (if different). *See Alma*, 490 F.3d at 620–21. Conversely, interexchange traffic generally involves three carriers: (1) the originating LEC, (2) an IXC to carry the call between the exchange areas, and (3) a terminating LEC. *See id.* at 621. Wireline end-users select both their LEC and their IXC and have separate billing relationships with each. *See id.*

But for wireless-to-wireline traffic—that is, calls originating or

terminating on CMRS networks—the FCC has the exclusive power to "define the local service area . . . ." *Local Competition Order*, 11 F.C.C. Rcd. at 16014 ¶ 1036.  Exercising that power, the FCC has determined that the MTA is the "most appropriate definition for local service area for CMRS traffic for purposes of reciprocal compensation . . . ." *Id.*  MTAs ordinarily are much larger than exchange areas and sometimes cross state lines.[9]  Calls exchanged between end-users in the same MTA ("intraMTA") are local, and calls exchanged between end-users in different MTAs ("interMTA") are long-distance.

IntraMTA traffic can pose special problems, however.  CMRS providers can exchange calls straight with LECs if they directly interconnect, and reciprocal compensation governs compensation between the carriers in that situation.  *See id.*  But sometimes CMRS providers interconnect with LECs only indirectly, through a third party (such as an IXC), presumably because it is more cost-efficient to do so.[10]  That situation creates a special problem under Congress's and the FCC's regulatory regime, because, unlike most other local traffic, it involves three carriers instead of two.  It's also not obvious what is the relevant "local area" once an IXC is involved.  Those calls are, in some sense, both *intra*MTA and *inter*exchange, *i.e.*, both local and long-distance.

B.

This dispute boils down to a disagreement about what compensation LECs can collect for intraMTA wireless-to-wireline calls carried by an IXC.

---

[9] *TSR Wireless, LLC v. US W. Commc'ns, Inc.*, 15 FCC Rcd. 11166, 11184 ¶ 31 (2000) ("MTAs typically are large areas that may encompass multiple LATAs, and often cross state boundaries."); *see also Sw. Bell*, 348 F.3d at 485 n.4 ("[A] LATA is larger than, but not synonymous with, an 'exchange area.'").

[10] *See Alma*, 490 F.3d at 622 ("In fact, cell-phone companies usually do not choose to connect directly with rural [LECs], because the volume of business does not make it economically advantageous for the cell-phone company to do so.").

No. 18-10768

Sprint, Verizon, and Level 3 believe that only reciprocal compensation is due, which would mean that they aren't required to pay LECs access charges for those calls. The LECs believe that *both* compensation regimes apply: Reciprocal compensation is owed between CMRS providers and LECs, and access charges are owed by IXCs to LECs. Both before and after the 1996 Act, the LECs have assessed IXCs access charges for that traffic.

For almost two decades after the 1996 Act was passed, Sprint and Verizon paid the LECs' tariffed access charges without dispute. That all changed in 2014 when Sprint and Verizon sued numerous LECs across the United States. Believing that they had been systematically assessed access charges that they didn't owe, Sprint and Verizon asserted (1) claims under 47 U.S.C. §§ 206 and 207 and (2) state-law breach of contract claims related to the LECs' published tariffs.[11] They sought damages, in the form of refunds for access charges they'd already paid, as well as a declaratory judgment stating that they didn't owe access charges on intraMTA wireless-to-wireline traffic going forward. Under 28 U.S.C. § 1407, the Judicial Panel on Multidistrict Litigation consolidated the actions and transferred them to the court *a quo* for pretrial proceedings. *See In re: IntraMTA Switched Access Charges Litig.*, 67 F. Supp. 3d 1378 (J.P.M.L. 2014).

The LECs jointly moved to dismiss. The district court granted the motion as to Sprint and Verizon's federal-law claims, holding that (1) no statute or FCC regulation had "explicitly superseded" the LECs' pre-1996 practice of charging IXCs access charges for intraMTA wireless-to-wireline calls and (2) the filed-rate doctrine therefore barred the refunds. The court dismissed Sprint and Verizon's state-law claims, because (1) intrastate access charges

---

[11] Level 3 hasn't filed any lawsuits, but it has refused to pay the LECs' tariffed access charges.

were permissible under federal law, (2) Sprint and Verizon hadn't identified any state law that prohibited the charges, and (3) they hadn't alleged that the access charges violated tariffs filed with state authorities.

The district court offered those companies an opportunity to replead their state-law claims, and Sprint (but not Verizon) did so. Shortly thereafter, the LECs moved to dismiss Sprint's amended complaints. The court again dismissed, finding that Sprint had "failed to plausibly allege either a state law or a specific state tariff that prohibit[ed] LECs from charging IXCs access charges on intrastate intraMTA calls."

After the claims against them were dismissed, many (but not all) of the LECs filed counterclaims against Sprint and Verizon. Several LECs also filed new claims against Level 3. Collectively, those claims sought to recover unpaid and late access charges.[12] Level 3 moved to dismiss the claims against it, but the court denied that motion for essentially the same reasons it granted the LECs' motion to dismiss. The LECs then moved for summary judgment on all of their claims. After reviewing the parties' stipulations regarding the access charges owed, the court granted summary judgment to the LECs. Sprint, Verizon, and Level 3 appeal.[13]

---

[12] At oral argument, Verizon's counsel—advocating on behalf of all the IXCs—confirmed that (1) Sprint stopped paying the LECs access charges just before filing suit and (2) Verizon stopped paying the access charges immediately after filing suit. Neither Sprint nor Verizon has paid access charges to the LECs since 2014. Counsel didn't state when Level 3 stopped paying such charges.

[13] Final judgments were entered in each case individually. Sprint and Verizon each filed thirty-two appeals, and Level 3 and their affiliates filed the rest. The appeals primarily focus on Sprint and Verizon's federal-law claims. Sprint and Verizon appeal the dismissal of their state-law claims only to the extent that federal law preempts state laws authorizing LECs to assess access charges on intrastate intraMTA wireless-to-wireline traffic.

No. 18-10768

II.

Sprint and Verizon's claims span several regulatory regimes, so it's necessary to canvas the history of American telecommunications regulation.

A.

Before 1984, American Telephone & Telegraph Company ("AT&T") held a near-national monopoly on local wireline telephone service through its Bell Operating Companies ("BOCs"). *See United States v. Am. Tel. & Tel. Co. (Modification of Final Judgment)*, 552 F. Supp. 131, 139 n.19 (D.D.C. 1982). In response to the DOJ's landmark 1974 antitrust suit, however, the government and AT&T proposed a consent decree that made "significant structural changes" to AT&T. *Id.* at 141.

Chief among those modifications was AT&T's agreement to divest its LECs. *Id.* That divestiture effectively created a LEC market characterized by a system of government-sanctioned "regional service monopolies," colloquially known as "'Regional [BOCs],' 'Baby Bells,' or 'Incumbent Local Exchange Carriers' (ILECs)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 549 (2007). Each LEC could connect and carry intraexchange wireline-to-wireline calls without having to cooperate with any other carriers.[14]

Another consequence of the divestiture was a separate, competitive market for interexchange wireline service from which the LECs were excluded. *See id.* IXCs connected and carried calls between LECs and paid "access charges" to both the originating and terminating LEC for the right to connect to their exchange networks. *See Modification of Final Judgment*, 552 F. Supp. at 169.

The *Modification of Final Judgment* provided some baseline terminology

---

[14] *See Alenco*, 201 F.3d at 616–17 (noting that LECs traditionally possessed "monopoly networks" within their exchange areas).

that the FCC later adopted.[15]   For example, it defined "exchange access" to mean "the provision of exchange services for the purpose of originating or terminating interexchange telecommunications."   *Id.* at 228.   Relatedly, "exchange access services include[d] any activity or function performed by a BOC in connection with the origination or termination of interexchange telecommunications."[16]  And "[e]xchange area" was defined, in relevant part, as a "geographic area established by a BOC . . .   [consisting of] one or more contiguous local exchange areas serving common social, economic, and other purposes . . . ."[17]

After the divestiture was completed in 1984, the FCC adopted regulations governing exchange access services and access charges.   *See* 47 C.F.R. §§ 69.1 *et seq.* (1984).   The FCC defined "[a]ccess service[s]" to include "services and facilities provided for the origination or termination of *any* interstate or foreign telecommunication."   *Id.* § 69.2(b) (emphasis added).   The regulations also provided that "carrier charges," including access charges, "shall be computed and assessed upon all [IXCs] that use local exchange switching facilities for the provision of interstate or foreign telecommunications services."   *Id.*

---

[15] *See In re MTS & WATS Mkt. Structure,* 93 F.C.C.2d 241, 244 (1983) ("Although the tentative plan we described in 1980 would have limited the definition of access to facilities that are used in common by exchange and interexchange services, we have expanded the definition of access to correspond with the *Modifi[cation of] Final Judgment . . . .*").

[16] *Modification of Final Judgment*, 552 F. Supp. at 228. "Interexchange telecommunications" were defined as "telecommunications between a point or points located in one exchange telecommunications area and a point or points located in one or more other exchange areas or a point outside an exchange area." *Id.* at 229.

[17] *Id.* at 229. *The Modification of Final Judgment* also established three other geographic requirements: (1) "[E]very point served by a BOC within a State shall be included within an exchange area"; (2) "no such area which includes part or all of one standard metropolitan statistical area . . . shall include a substantial part of any other standard metropolitan statistical area"; and (3) "no exchange area located in one State shall include any point located within another State." *Id.*   It used the term "exchange" interchangeably with "exchange area." *Id.*

No. 18-10768

§ 69.5(b). The LECs had to file tariffs for their access charges with the FCC. *See id.* §§ 69.3, 69.4.

B.

In 1996, Congress rejected that monopoly-focused regime and "fundamentally change[d] telecommunications regulation." *Local Competition Order*, 11 F.C.C. Rcd. at 15505 ¶ 1. The 1996 Act ushered in a new system meant to "remove the outdated barriers that protect monopolies from competition and affirmatively promote efficient competition . . . ." *Id.*

The 1996 Act began by carrying forward several statutory terms from the Communications Act of 1934, Pub. L. No. 73–416, 48 Stat. 1064 (codified, as amended, in scattered sections of title 47, U.S. Code) (the "1934 Act"). One is particularly relevant: "telephone toll service," which referred to "telephone service between stations in different exchange areas for which there is made a separate charge not included in contracts with subscribers for exchange service."[18] The 1996 Act also introduced two new terms: "exchange access" and "local exchange carrier." It defined "exchange access" as "the offering of access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services." 47 U.S.C. § 153(16) (Supp. 1997). Relatedly, "local exchange carrier" meant "any person that is engaged in the provision of telephone exchange service or exchange access." *Id.* § 153(26). Each

---

[18] 47 U.S.C. § 153(s) (1934); 47 U.S.C. § 153(48) (Supp. 1997). "Telephone toll service" is distinct from "telephone exchange service." The latter is defined in two ways: (1) "service within a telephone exchange, or within a connected system of telephone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily furnished by a single exchange, and which is covered by the exchange service charge"; and (2) "comparable service provided through a system of switches, transmission equipment, or other facilities (or combination thereof) by which a subscriber can originate and terminate a telecommunications service." 47 U.S.C. § 153(47) (Supp. 1997). The 1996 Act added the second definition but carried forward the first from the 1934 Act. *See* 47 U.S.C. § 153(r) (1934).

11

No. 18-10768

of those statutory definitions, though renumbered, remains unchanged.[19] Critically, the 1996 Act didn't devise any definitions for traffic exchanged between wireless and wireline phones.

To effect the 1996 Act's purpose, Congress took two steps. First, to remove barriers to competition in the market for local telecommunications services, Congress provided that "[n]o State or local statute or regulation . . . may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." *Id.* § 253(a). And second, to increase competition, Congress enacted § 251, which "impose[d] three tiers of duties on three different, statutorily defined categories of telecommunications-related entities . . . ." *Pac. Bell v. Cook Telecom, Inc.*, 197 F.3d 1236, 1237 (9th Cir. 1999).

Most pertinently, § 251 imposes two duties on LECs. First, they have a duty "to interconnect directly or indirectly with the facilities and equipment of other telecommunications carriers."[20] Second, LECs have an affirmative "duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications."[21] Under the old local-monopoly framework, the same LEC would originate, carry, and terminate all calls within its exchange area. But on account of new LEC market entrants, end-users in the

---

[19] *See* 47 U.S.C. § 153(20) (2012) (exchange access); *id.* § 153(32) (LEC); *id.* § 153(54) (telephone exchange service); *id.* § 153(55) (telephone toll service).

[20] 47 U.S.C. § 251(a)(1) (Supp. 1997). The FCC clarified "that telecommunications carriers should be permitted to provide interconnection pursuant to [§] 251(a) either directly or indirectly, based upon their most efficient technical and economic choices." *Local Competition Order*, 11 F.C.C. Rcd. at 15991 ¶ 997. The 1996 Act also imposed a further duty on ILECs to provide "any requesting telecommunications carrier" with "interconnection with the[ir] . . . network[s]" so that "telephone exchange service and exchange access" could be routed. 47 U.S.C. § 251(c)(2)(A) (Supp. 1997).

[21] 47 U.S.C. § 251(b)(5) (Supp. 1997). The 1996 Act didn't define "reciprocal compensation arrangements," "transport," or "termination." But the FCC defined those terms in the *Local Competition Order*. *See* 47 C.F.R. §§ 51.701(c)–(e) (1996).

No. 18-10768

same exchange area often subscribed to different LECs. Under reciprocal compensation, the originating LEC pays the terminating LEC a fee reasonably approximating the costs of terminating the call. *See* 47 U.S.C. § 252(d)(2)(A)(ii) (Supp. 1997).

Given the significant changes Congress made to telecommunications regulation, it also took steps to facilitate a transition for carriers. To avoid upsetting settled compensation practices, at least until the FCC stepped in to regulate,[22] Congress included a clause temporarily preserving the status quo:

> On and after February 8, 1996, each [LEC], to the extent that it provides wireline services, shall provide exchange access, information access, and exchange services for such access to [IXCs] and information service providers in accordance with the same equal access and nondiscriminatory interconnection restrictions and obligations (*including receipt of compensation*) that apply to such carrier on the date immediately preceding February 8, 1996, under any court order, consent decree, or regulation, order, or policy of the Commission, *until such restrictions and obligations are explicitly superseded by regulations prescribed by the Commission* after February 8, 1996. During the period beginning on February 8, 1996, and until such restrictions and obligations are so superseded, such restrictions and obligations shall be enforceable in the same manner as regulations of the Commission.

*Id.* § 251(g) (emphasis added). Put plainly, the 1996 Act grandfathered in the pre-1996 compensation frameworks—including the access charge regulations—until the FCC explicitly superseded them. *See CenturyTel of Chatham, LLC v. Sprint Commc'ns Co.*, 861 F.3d 566, 570 (5th Cir. 2017).

## C.

On August 8, 1996, the FCC issued an order implementing the 1996 Act's

---

[22] The 1996 Act required the FCC to "complete all actions necessary to establish regulations to implement the requirements of [§ 251]" within six months of the Act's passage. 47 U.S.C. § 251(d)(1) (Supp. 1997).

local-competition provisions. *See generally Local Competition Order*, 11 F.C.C. Rcd. 15499. The FCC issued significant guidance about § 251(b)(5)'s reciprocal compensation regime, but it led with a big caveat: "Nothing in this Report and Order alters the collection of *access charges paid by an [IXC] under Part 69 of the [FCC]'s rules . . . .*"[23] Importantly, the FCC wasn't supplanting its pre-Act access charge regulations.

Although the *Local Competition Order* spills a lot of ink, the bulk of the *Order* that is relevant to this dispute relates to what is colloquially called the "IntraMTA Rule." That Rule outlines the relationship under § 251(b)(5) between LECs and CMRS providers. Though the *Order* alludes to IXCs' place within that framework, it doesn't focus on IXCs.

Before evaluating what obligations LECs and CMRS providers owed to one another, the FCC first resolved how CMRS providers fit within the regulatory framework. The FCC made two threshold decisions. First, it declined to treat CMRS providers as LECs, even though CMRS providers could originate and terminate calls within a single exchange area. *Id.* at 15995–96 ¶¶ 1004, 1006. And second, the FCC found that "CMRS providers offer[ed] telecommunications," which obligated LECs "to enter into reciprocal compensation arrangements with [them]." *Id.* at 15997 ¶ 1008.

Next, the FCC sketched out the boundaries of LECs' duty to enter into reciprocal compensation agreements with CMRS providers. The FCC divvied all traffic into two buckets: "local" and "long distance." *Id.* at 16012–13 ¶ 1033. Reciprocal compensation applied "only to traffic that originate[d] and

---

[23] *Local Competition Order*, 11 F.C.C. Rcd. at 15515 ¶ 30 (emphasis added). Though the FCC noted that "access charge reform is intensely interrelated with the local competition rules of [§] 251," it committed to complete that reform either "before or concurrently with a final order on universal service." *Id.* at 15507 ¶ 8.

terminate[d] within a local area." *Id.* at 16013 ¶ 1034. Access charges, on the other hand, were "governed by sections 201 and 202," and, as a result, by the FCC's access charge regulations. *Id.* at 16013 ¶ 1033.

"Local area" was defined in two ways. For traffic that didn't involve a CMRS provider, "local area" was generally defined by reference to "exchange areas."[24] But for calls that involved a CMRS provider, the FCC determined that the MTA was "the most appropriate definition for local service area . . . ." *Id.* at 16014 ¶ 1036. "Accordingly, traffic to or from a CMRS network that originates and terminates within the same MTA is subject to transport and termination rates under [§] 251(b)(5), rather than interstate and intrastate access charges." *Id.* Conversely, for both wireline-to-wireline and wireless-to-wireline calls, "[t]raffic originating or terminating outside of the applicable local area would be subject to interstate and intrastate access charges."[25]

In reaching that conclusion, the FCC explicitly rejected the "contention that [§] 251(b)(5) entitles an IXC to receive reciprocal compensation from a LEC when a long-distance call is passed from the LEC serving the caller to the IXC." *Id.* at 16013 ¶ 1034. The FCC offered the following discussion as to why:

> Access charges were developed to address a situation in which *three carriers*—typically, the originating LEC, the IXC, and the

---

[24] *See id.* at 16014 ¶ 1037 ("We conclude that [§] 251(b)(5) obligations apply to all LECs in the same state-defined local exchange service areas, including neighboring incumbent LECs that fit within this description."); *see also id.* at 16013 ¶ 1035 ("With the exception of traffic to or from a CMRS network, state commissions have the authority to determine what geographic areas should be considered 'local areas' for the purpose of applying reciprocal compensation obligations under [§] 251(b)(5) . . . .").

[25] *Id.* at 16013 ¶ 1035; *see also id.* at 16016 ¶ 1043 ("Under our existing practice, most traffic between LECs and CMRS providers is not subject to interstate access charges *unless it is carried by an IXC* . . . ." (emphasis added)); *In re The Need to Promote Competition & Efficient Use of Spectrum for Radio Common Carrier Servs.*, 1986 WL 1248411, at *12 n.3 (F.C.C. Mar. 5, 1986) (recognizing that "to the extent that a cellular operator does provide interexchange service through switching facilities provided by a telephone company, its obligation to pay carrier's carrier charges is defined by § 69.5(b) of our rules").

terminating LEC—collaborate to complete a long-distance call. . . . By contrast, reciprocal compensation for transport and termination of calls is intended for a situation in which *two carriers* collaborate to complete a local call. . . . We note that our conclusion that long distance traffic is not subject to the transport and termination provisions of [§] 251 does not in any way disrupt the ability of IXCs to terminate their interstate long-distance traffic on LEC networks. Pursuant to [§] 251(g), LECs must continue to offer tariffed interstate access services just as they did prior to enactment of the 1996 Act. *We find that the reciprocal compensation provisions of [§] 251(b)(5) for transport and termination of traffic do not apply to the transport or termination of interstate or intrastate interexchange traffic.*

*Id.* (emphasis added).

As part of the *Local Competition Order*, the FCC promulgated regulations governing "reciprocal compensation for transport and termination of local telecommunications traffic between LECs and other telecommunications carriers." 47 C.F.R. § 51.701(a) (1996). The regulations defined "[l]ocal telecommunication traffic" as

(1) Telecommunications traffic between a LEC and a telecommunications carrier other than a CMRS provider that originates and terminates within a local service area established by the state commission; or

(2) Telecommunications traffic between a LEC and a CMRS provider that, at the beginning of the call, originates and terminates within the same Major Trading Area . . . .

*Id.* § 51.701(b). Notably, those definitions speak to the nature of the traffic as well as the parties involved in originating, transporting, and terminating it. LECs weren't permitted to "assess charges on any other telecommunications carrier for local telecommunications traffic that originate[d] on [their] network[s]." *Id.* § 51.703(b).

### D.

A few years later, the FCC addressed "whether intercarrier

compensation for ISP-bound traffic" was subject to reciprocal compensation under § 251(b)(5) or whether the existing compensation regime—"in which the originating carrier pays the carrier that serves the ISP"—was grandfathered in under § 251(g). *In re Implementation of the Local Competition Provisions in the Telecomms. Act of 1996 (Intercarrier Compensation Order)*, 16 F.C.C. Rcd. 9151, 9153–54 ¶¶ 2–3 (2001). To answer that question, the FCC undertook a detailed analysis of the 1996 Act, especially the interplay between § 251(b)(5) and § 251(g). *See id.* at 9163–81 ¶¶ 23–65.

The FCC first recognized that, "[i]n the *Local Competition Order*, [it had] determined that the reciprocal compensation provisions of [§] 251(b)(5) applied only to what it termed 'local' traffic rather than to the transport and termination of interexchange traffic." *Id.* at 9163 ¶ 24. But upon "[a] more comprehensive review of the statute," the FCC acknowledged "that Congress intended to exempt certain enumerated categories of service from [§] 251(b)(5) when the service was provided to [IXCs] or information service providers."[26] In other words, § 251(g)'s "exemption focuses not only on the nature of the service, but on to *whom the service is provided*." *Id.* at 9165 ¶ 30 (emphasis added).

Central to the analysis was "the recognition that [§] 251(g) is properly viewed as a limitation on the scope of [§] 251(b)(5) . . . ." *Id.* at 9167 ¶ 35. Because § 251(g) was best understood "as a carve-out provision," the focus necessarily had to be "on the universe of traffic that falls within [§ 251(g)] and *not* the universe of traffic that falls within [§ 251(b)(5)]." *Id.* at 9167 ¶ 34. That reasoning "differ[ed] from [the FCC's] analysis in the *Local Competition Order*," which had incorrectly focused on whether traffic was "local" even

---

[26] *Intercarrier Compensation Order*, 16 F.C.C. Rcd. at 9165 ¶ 30. The FCC reached that epiphany in response to the D.C. Circuit's strong criticism of its reading of § 251. *See Bell Atl. Tel. Cos. v. FCC*, 206 F.3d 1, 8–9 (D.C. Cir. 2000).

though that term was "particularly susceptible to varying meanings" and wasn't used in § 251(b) or (g) at all. *Id.*

Based on that, "it [was] clear from the Act that Congress did *not* intend all access charges to move to cost-based pricing, at least not immediately." *Id.* at 9169 ¶ 38 (quoting *Competitive Telecomms. Ass'n v. FCC*, 117 F.3d 1068, 1072 (8th Cir. 1997) (emphasis added)). "Congress specifically exempted the services enumerated under [§] 251(g)"—all of which were "access services or services associated with access"—"from the newly imposed reciprocal compensation requirement . . . ."[27]  Consequently, "until the [FCC] by regulation . . . determine[d] otherwise, Congress preserved the pre-Act regulatory treatment of all the access services enumerated under [§] 251(g)." *Id.* at 9169 ¶ 39.

### E.

In 2011, the FCC "comprehensively reform[ed] and modernize[d] the universal service and intercarrier compensation systems . . . ." *In re Connect Am. Fund (Comprehensive Reform Order)*, 26 F.C.C. Rcd. 17663, 17667 ¶ 1 (2011). Specifically, the FCC "adopt[ed] a uniform national bill-and-keep framework as the ultimate end state for all telecommunications traffic exchanged with a LEC.  Under bill-and-keep, carriers look first to their subscribers to cover the costs of the network, then to explicit universal service support where necessary." *Id.* at 17676 ¶ 34.

The FCC began by recognizing that it hadn't "previously regulated access traffic under [§] 251(b)(5)," because § 251(g) "preserved the pre-1996 Act regulatory regime that applies to access traffic . . . ." *Id.* at 17915–16 ¶ 763.  It

---

[27] *Intercarrier Compensation Order*, 16 F.C.C. Rcd. at 9167–68 ¶¶ 36–37.  Because both the FCC and its corresponding state regulators already "had in place access regimes applicable to th[at] traffic," it made "sense that Congress did not intend to disrupt these pre-existing relationship[s]." *Id.* at 9168 ¶ 37.

wasn't because § 251(b)(5) didn't apply to that traffic; by its plain terms, it applied to *all* telecommunications traffic. *See id.* at 17917 ¶ 766. Instead, "[§] 251(g) preserves [the pre-1996] access charge rules only during a transitional period, which ends when [the FCC] adopt[s] superseding regulations." *Id.* The FCC took up that task for some, but not all, access traffic in the *Comprehensive Reform Order. See id.* at 17916 ¶ 764.

As part of the *Order*, the FCC reaffirmed the IntraMTA Rule's basic principles and clarified that "non-access telecommunications traffic" was subject to the reciprocal compensation rules originally promulgated in the *Local Competition Order*.[28] The *Order* also stated "that all traffic routed to or from a CMRS provider that, at the beginning of a call, originates and terminates within the same MTA, is subject to reciprocal compensation, without exception."[29] The FCC also explained that was the case "regardless of whether the two end carriers are directly connected or exchange traffic indirectly via a transit carrier." *Id.* at 18043 ¶ 1007. It did not specifically elucidate what compensation IXCs must pay LECs for intraMTA wireless-to-wireline calls.

---

[28] "Non–Access Telecommunications Traffic" is defined, in relevant part, as

(1) Telecommunications traffic exchanged between a LEC and a telecommunications carrier other than a CMRS provider, except for telecommunications traffic that is interstate or intrastate exchange access, information access, or exchange services for such access . . . . ; or

(2) Telecommunications traffic exchanged between a LEC and a CMRS provider that, at the beginning of the call, originates and terminates within the same Major Trading Area. . . .

47 C.F.R. § 51.701(b) (2013). "Non-Access Telecommunications Traffic" replaced "local telecommunications traffic" as it was defined under the *Local Competition Order. See* 47 C.F.R. § 51.701(b) (1996).

[29] *Comprehensive Reform Order*, 26 F.C.C. Rcd. at 18032 ¶ 979; *see also id.* at 18041 ¶ 1003 ("In the *Local Competition . . . Order*, the [FCC] stated that calls between a LEC and a CMRS provider that originate and terminate within the same [MTA] at the time that the call is initiated are subject to reciprocal compensation obligations under [§] 251(b)(5), rather than . . . access charges.").

No. 18-10768

To reform the pre-1996 access charge regime, the FCC divided access charges into two buckets: "originating access charges" and "terminating access charges." *See id.* at 17916 ¶ 764. That distinction turns on which LEC imposes the charge: Originating LECs assess originating access charges, and terminating LECs charge terminating access charges.

The FCC took limited action regarding originating access charges. Although it believed "that the originating access regime should be reformed," it didn't bring originating access charges under § 251(b)(5)'s reciprocal compensation rules. *Id.* at 17923 ¶ 777. The FCC capped all interstate (and some intrastate) originating access charges, *id.* at 17933–34 ¶¶ 800–01, but it clarified that "[§] 251(g) continue[d] to preserve originating access until [the FCC] adopt[ed] rules to transition away from that system." *Id.* at 17923 ¶ 778. In other words, originating access charges were still governed by Part 69 of the FCC's regulations. *See* 47 C.F.R. §§ 69.1 *et seq.* (1984).

For terminating access charges, however, the FCC made significant revisions. It "explicitly supersede[d] the traditional access charge regime and, subject to [a transition schedule], regulate[d] terminating access traffic in accordance with the [§] 251(b)(5) framework." *Id.* at 17916 ¶ 764. But even though the *Order* revoked any authority to impose terminating access charges under § 251(g), it didn't require that change be completed overnight. Instead, it promulgated a new set of rules that applied to "access reciprocal compensation."[30] Those rules allowed LECs to continue imposing terminating access

---

[30] *See* 47 C.F.R. §§ 51.901 *et seq.* (2013). "Access Reciprocal Compensation means telecommunications traffic exchanged between telecommunications service providers that is interstate or intrastate exchange access, information access, or exchange services for such access, other than special access." *Id.* § 51.903(h). The FCC also issued a regulation providing that the new and amended reciprocal compensation regulations superseded any conflicting access charge regulations. *See id.* § 69.1(d).

No. 18-10768

charges, subject to the FCC's prescribed phase-out timetable and caps on the rates they can charge. *See* 47 C.F.R. §§ 51.907, 51.909 (2013).

Under that transition schedule, the FCC divided LECs into two camps: (1) price cap carriers and (2) rate-of-return carriers. *See id.* § 51.903(f)–(g). Price-cap carriers encompass the most market-dominant LECs, including the Baby Bells, the GTE Operating Company, and their cost affiliates.[31] Rate-of-return carriers include all other LECs and are governed by "a 'cost-plus' system of regulation," which permits them to recover their "costs plus a return on invested capital." *LEC Price Cap Order*, 5 F.C.C. Rcd. at 6787 ¶ 1. Price cap carriers were subject to a seven-year transition that ended on July 1, 2018. *See* 47 C.F.R. § 51.907 (2013). Conversely, rate-of-return carriers were granted a nine-year sunset period ending on July 1, 2020. *See id.* § 51.909.

## III.

We review both Rule 12(b)(6) dismissals and summary judgments *de novo*. *See Howell v. Town of Ball*, 827 F.3d 515, 521 (5th Cir. 2016). This appeal raises only one question: Under federal law, can LECs assess IXCs access charges when LECs provide services that enable IXCs to exchange intraMTA wireless-to-wireline calls? They can.

## A.

Because Sprint and Verizon seek refunds for access charges they paid as far back as 1996, we must first assess the state of play when the 1996 Act was passed. We begin with the relevant statutory text: § 251(b)(5) and (g). The FCC reads § 251(b)(5) to apply to all telecommunications traffic, subject only

---

[31] *See In re Policy & Rules Concerning Rates for Dominant Carriers (LEC Price Cap Order)*, 5 F.C.C. Rcd. 6786, 6818 ¶¶ 258, 262 (1990). Other LECs may voluntarily opt into price cap regulation. *See id.* at 6818 ¶ 261.

No. 18-10768

to § 251(g)'s limited exemptions for "certain enumerated categories of service." *Intercarrier Compensation Order*, 16 F.C.C. Rcd. at 9165 ¶ 30. No one disputes that all carriers involved in connecting intraMTA wireless-to-wireline calls provide telecommunications services. The threshold question is whether the services that LECs provide to IXCs related to those calls fall within one of § 251(g)'s exemptions.

One of the defined exemptions under § 251(g) is for "exchange access." Recall that "exchange access" is defined as "the offering of access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services." 47 U.S.C. § 153(16) (Supp. 1997). There's no question that the LECs are offering access to their facilities; Sprint and Verizon can't connect and carry the traffic at issue without using the LECs' infrastructure. The critical question, then, is whether the LECs are providing access to those facilities for telephone toll services.

For traffic to constitute "telephone toll service," two things must be true: (1) The service must be "between stations in *different exchange areas*"; and (2) a "separate charge" must be made for that service that is "not included in contracts with subscribers for *exchange service*." *Id.* § 153(48) (emphasis added). Because, in the district court and on appeal, Sprint and Verizon didn't assert any position related to the "separate charge" requirement—despite the LECs' identifying that infirmity—Sprint and Verizon have forfeited any contention that it isn't satisfied.[32] That leaves only the "different exchange area"

---

[32] *See, e.g., FDIC v. Mijalis*, 15 F.3d 1314, 1327 (5th Cir. 1994) ("[I]f a litigant desires to preserve an argument for appeal, the litigant must press and not merely intimate the argument during the proceedings before the district court."). But even if the issue was properly preserved, there is little reason to believe that the "separate charge" requirement isn't satisfied. All that provision calls for is a charge that isn't "included in contracts with subscribers for exchange service." 47 U.S.C. § 153(48) (Supp. 1997). Notably, the statute doesn't say *what entity* must be charged or *in what manner* it must be charged.

condition.

Sprint and Verizon` maintain that LECs can't impose access charges on intraMTA wireless-to-wireline traffic because those calls don't involve exchange access.  Sprint and Verizon's theory rests on four pillars.  First, § 251(g) preserved access charges for only a few types of traffic, including "exchange access."  Second, exchange access applies only "for toll calls between 'exchange areas'—*i.e.*, long-distance calls."  Third, the *Local Competition Order* determined that intraMTA wireless-to-wireline calls are "local" traffic.  And fourth, because intraMTA calls are local, they don't involve exchange access.  That reading of the statute, Sprint and Verizon aver, is confirmed by the *Local Competition Order*, the *Comprehensive Reform Order*, and the corresponding

---

Consider the following example:  A wireline customer (Caller A) calls a wireless customer (Caller B) outside her local exchange area but within the same MTA.  Because Caller B's CMRS provider doesn't directly interconnect with Caller A's LEC's infrastructure, the call is routed through an IXC.  When Caller A originates the call, her LEC will route that call to her chosen IXC, much the same way it would if she placed an interexchange wireline-to-wireline call.  Caller A's IXC would pay her LEC an access charge, and her LEC could pay Caller B's CMRS provider reciprocal compensation.  Caller A's IXC would then charge Caller A for that call.  That arrangement satisfies the separate-charge requirement, because Caller A doesn't pay a charge for "exchange service."

Now consider the same facts but with Caller B originating the call.  In that case, the call could be routed to an IXC with whom Caller B doesn't have a billing relationship.  *See In re Interconnection & Resale Obligations Pertaining to Commercial Mobile Radio Servs.*, 11 F.C.C. Rcd. 12456, 12457 ¶ 2 (1996) (recognizing that CMRS providers aren't required "to provide equal access to common carriers for the provision of telephone toll services").  But that doesn't mean that there isn't a "separate charge" for that call.  Caller B's CMRS provider would pay a charge to the IXC to carry the call, and the IXC would pay Caller A's LEC an access charge that it could then pass on to Caller B's CMRS provider.  *See Alma*, 490 F.3d at 622 ("When the cell-phone to land-line traffic goes through an [IXC], [CMRS provider] T-Mobile pays the [IXC] both for the [IXC]'s services and for the fee the terminating [LEC] charges to deliver the call.").  Caller B's CMRS provider would then be free to recover those costs through charges for toll service.  *See In re Policy & Rules Concerning the Interstate Interexchange Marketplace (254(g) Implementation Order)*, 14 F.C.C. Rcd. 6994, 6995 ¶ 2 (1999) (noting that "CMRS customers generally pay a flat monthly fee" for "local" service but often pay "long-distance charge[s]" or "roaming charge[s]" when originating calls outside the local area). That's enough to satisfy the "separate charge" requirement:  Neither Caller B nor his CMRS provider is being assessed a charge for "exchange service."

reciprocal compensation regulations.[33]

Sprint and Verizon's interpretation collapses, because its second support improperly imports the *Local Competition Order*'s use of the term "local" into the 1996 Act's text. The Act defines "telephone toll service" in terms of "exchange areas," not whether the traffic is "local." The FCC didn't introduce the intraMTA–interMTA dichotomy for traffic involving CMRS providers until the FCC promulgated the *Local Competition Order*, more than *six months after the 1996 Act was passed.* In that sense, Sprint and Verizon essentially make the same mistake that the FCC recognized it made when promulgating the *Local Competition Order. See Intercarrier Compensation Order,* 16 F.C.C. Rcd. at 9167 ¶ 34.

The term "exchange areas"—as it was used on February 8, 1996, when the Act was signed into law and § 251(g) grandfathered in the then-existing access charge framework—is best understood to refer to the geographic areas traditionally served by a single LEC.[34] Accordingly, the intraMTA wireless-to-wireline calls at issue in this case, which were connected across exchange boundaries using the LECs' FGD trunks, constitute "telephone toll service." And

---

[33] Sprint and Verizon cite several snippets of language from those orders and regulations. *See, e.g.*, *Local Competition Order*, 11 F.C.C. Rcd. at 16014 ¶ 1036 ("[T]raffic to or from a CMRS network that originates and terminates within the same MTA is subject to transport and termination rates under [§] 251(b)(5), rather than interstate and intrastate access charges.); *id.* at 16016 ¶ 1043 ("We reiterate that traffic between an [I]LEC and a CMRS network that originates and terminates within the same MTA . . . is subject to transport and termination rates under [§] 251(b)(5), rather than interstate or intrastate access charges."); *Comprehensive Reform Order*, 26 F.C.C. Rcd. at 18043 ¶ 1007 ("[I]ntraMTA traffic is subject to reciprocal compensation regardless of whether the two end carriers are directly connected or exchange traffic indirectly via a transit carrier."); 47 C.F.R. § 51.701(b)(2) (2013) (defining "Non-Access Telecommunications Traffic" as "[t]elecommunications traffic exchanged between a LEC and a CMRS provider that, at the beginning of the call, originates and terminates within the same [MTA]").

[34] *See Modification of Final Judgment*, 552 F. Supp. at 229 (defining "exchange area" as a "geographic area established by a BOC . . . [consisting of] one or more contiguous local exchange areas serving common social, economic, and other purposes").

because those calls fit that definition, the services the LECs provide to Sprint and Verizon for those calls constitute "exchange access."

Sprint and Verizon attempt to counter that the *Local Competition Order* necessarily altered the definition of exchange area, suggesting that the *Order* defined the MTA as the appropriate geographical boundary for wireless-to-wireline calls. But Sprint and Verizon don't point us to any instance in which the FCC purported to offer an authoritative interpretation of either "telephone toll service" or "exchange area" for the purposes of determining whether a particular form of traffic involves "exchange access." Our independent research reveals none, either.[35] The *Local Competition Order*, 11 F.C.C. Rcd. at 15515 ¶ 30, interpreted and applied § 251(b)(5), not § 251(g) or § 153. Absent an authoritative agency interpretation, we interpret "exchange areas" consistently with its long-established meaning going back at least as far as the *Modification of Final Judgment*.[36]

Now, it's true that the definition of "telephone toll service" is most straightforwardly applied to wireline-to-wireline calls.[37] But just because it's

---

[35] In fact, the FCC has routinely offered up discussion that cuts against Sprint and Verizon. *See, e.g.*, *TSR Wireless*, 15 F.C.C. Rcd. at 11184 ¶ 31 ("[LEC-originated traffic that originates and terminates within the same MTA] . . . falls under our reciprocal compensation rules if carried by the [I]LEC, and under our access charge rules if carried by an [IXC]."); *In re Developing A Unified Intercarrier Comp. Regime*, 20 F.C.C. Rcd. 4685, 4746 ¶ 138 (2005) ("[W]e recognize that the current Commission rules may require that intraMTA calls dialed on a 1+ basis be routed through IXCs."). *But see In re Universal Serv. Contribution Methodology (2008 Contribution Order)*, 23 F.C.C. Rcd. 1411, 1414 ¶ 5 (2008) ("[F]or universal service purposes, toll services are telecommunications services that enable customers to communicate outside of their local exchange calling areas, and that, for wireless providers, this means outside the customer's plan-defined home calling area." (cleaned up)).

[36] Said differently, without an authoritative FCC interpretation there is nothing to which we can afford deference. *Cf. United States v. Mead Corp.*, 533 U.S. 218, 221 (2001) (holding that an agency interpretation that doesn't carry "the force of law" is only "eligible to claim respect according to its persuasiveness").

[37] *See Alma*, 490 F.3d at 620 (noting that "cell-phone providers do not fit neatly into" the FCC's regulatory framework); *Iowa Network Servs., Inc. v. Qwest Corp.*, 363 F.3d 683,

somewhat of a clunky fit for wireless-to-wireline traffic doesn't mean that it's inapplicable.[38] Congress carried forward the definition of "telephone toll service" from 1934, even though cell phones were widely used in 1996 and despite making groundbreaking changes to federal telecommunications regulation. *See* 47 U.S.C. § 153(s) (1934); 47 U.S.C. § 153(48) (Supp. 1997). Neither "telephone toll service" nor "telephone exchange service" is defined in reference to the type of carriers involved, and the FCC has recognized that CMRS providers may be involved in providing *either* service.[39]

Our interpretation also recognizes the relevant market practices over the last twenty-plus years. Sprint and Verizon's conduct, while certainly not dispositive, is nevertheless informative. Sprint and Verizon are among America's largest IXCs and are sophisticated market participants. Yet, they waited more

---

687 (8th Cir. 2004) ("Traditional notions of 'local exchange areas' do not fit neatly into this new world of wireless communications.").

[38] Sprint and Verizon recognized as much in their reply brief, in which they wisely observed that, before 1996, "all traffic between landline local exchange areas—wireless or wireline—was interexchange traffic, utilizing access services and subject to access charges."

[39] *See, e.g., Local Competition Order*, 11 F.C.C. Rcd. at 16000 ¶¶ 1014–15 ("We also believe that other definitions in the Act support the conclusion that [CMRS providers] provide telephone exchange service. . . .  The arguments that CMRS traffic flows may differ from wireline traffic, that CMRS providers' termination costs may differ from LECs, that CMRS service areas do not coincide with wireline local exchange areas, or that CMRS providers are not LECs, do not alter our conclusion . . . ."); *254(g) Implementation Order*, 14 F.C.C. Rcd. at 6999–7000 ¶13 (noting that "[t]he definition of 'telephone toll service' depends . . . on the definition of 'exchange services'" and reinforcing that the *Local Competition Order* found that CMRS providers provide exchange service); *2008 Contribution Order*, 23 F.C.C. Rcd. at 1414 ¶ 6 ("Toll service revenues are . . . revenues resulting from the provision of telecommunications services that enable customers to communicate outside of their local exchange calling areas.  In applying this definition to wireless carriers, the [FCC] indicated that certain wireless revenues fall within the definition of toll service revenues."); *In re Universal Serv. Contribution Methodology*, 21 F.C.C. Rcd. 7518, 7534 ¶ 29 (2006) ("For some wireless telephony providers, toll service revenues include these additional charges for intrastate, interstate, and international toll calls."); *In re Admin. of the N. Am. Numbering Plan*, 13 F.C.C. Rcd. 3201, 3206 ¶ 7 n.21 (1997) ("Even though they are not classified as LECs, CMRS providers also provide interexchange access services."); *In re Admin. of the N. Am. Numbering Plan Carrier Identification Codes (CICs)*, 12 F.C.C. Rcd. 8024, 8027 ¶ 3 n.11 (1997) (same).

No. 18-10768

than eighteen years to object to the LECs' access charges for intraMTA wireless-to-wireline calls, paying hundreds of millions of dollars in the process. Moreover, over that same timeframe, Sprint's and Verizon's LEC affiliates imposed access charges on IXCs, including on *each other*, for intraMTA wireless-to-wireline calls. We decline to award Sprint and Verizon, who sat on their hands for the better part of two decades, a nine-figure windfall based on an interpretation of § 251(g) that is divorced from both the 1996 Act's text and industry practice.

Section 251(g) was meant to preserve the pre-February 8, 1996, status quo related to intercarrier access charge compensation, and all parties acknowledge that, before that date, the LECs assessed Sprint, Verizon, and Level 3 access charges when they carried intraMTA wireless-to-wireline calls. Our interpretation is faithful both to that aim and the statutory text that Congress duly enacted. In sum, the LECs provide Sprint and Verizon with "exchange access" related to the intraMTA wireless-to-wireline calls at issue, because those calls constitute "telephone toll service." Therefore, § 251(g) preserves the pre-1996 access charge framework for that traffic until the FCC "explicitly supersedes" it.

B.

Because the 1996 Act doesn't define "explicitly" or "supersede," we afford those terms their "ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). "Explicitly" means "clearly and without any vagueness or ambiguity,"[40] and "supersede" means "[t]o annul, make void, or repeal

---

[40] *Explicitly*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/explicitly (last visited Apr. 17 2020); *see also Explicit,* BLACK'S LAW DICTIONARY (11th ed. 2019) (defining the term as "[c]lear, open, direct, or exact" or "[e]xpressed without ambiguity or vagueness; leaving no doubt").

No. 18-10768

by taking the place of."[41]    Thus, in no uncertain terms, the pre-1996 access charge framework remains in place unless and until the FCC affirmatively and unequivocally replaces it.

Until asked at oral argument, Sprint and Verizon didn't contend that an FCC regulation explicitly superseded the pre-1996 access charge framework. Instead, they put all their eggs into the intraMTA-traffic-doesn't-involve-exchange-access basket.  That approach is equal parts unavailing and telling. It's unavailing for the reasons set forth above:  Sprint and Verizon's reading of the 1996 Act isn't grounded in its text.  And it's telling, because if Sprint and Verizon had averred that the FCC had explicitly superseded the pre-1996 access charge regime, they would have essentially admitted that they aren't entitled to any refunds for almost the entire period for which they sought them.

That is so for one easy reason.  If § 251(g) grandfathered in the pre-1996 access charge regime, the FCC didn't supersede it until 2011 *at the earliest.* The *Local Competition Order* expressly disavowed any possibility that it repudiated anything related to access charges,[42] and Sprint and Verizon point to no intervening order that changed the status quo until the *Comprehensive Reform Order.*  Sprint and Verizon aren't due any refunds for the first fifteen of the eighteen years for which they seek them.

---

[41] *Supersede*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also Supersede*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/supersede (last visited Apr. 17, 2020) (defining the term to mean "to take the place or position of").

[42] *See Local Competition Order*, 11 F.C.C. Rcd. at 15515 ¶ 30 ("Nothing in this Report and Order alters the collection of access charges paid by an [IXC] under Part 69 of the [FCC]'s rules, when the [I]LEC provides exchange access service to an IXC . . . .").  Verizon and Sprint's observation that the *Local Competition Order* "repeats three times that LECs may not impose charges on 'a CMRS provider or other carrier' for LEC-originated intraMTA calls" doesn't change the calculus.  To allow that language to control in the face of statutory language to the contrary would effectively allow the FCC to supplant *sub silentio* what the 1996 Act requires it to supersede explicitly.

No. 18-10768

The parties disagree about the effect of the *Comprehensive Reform Order*. Sprint and Verizon aver that the *Order* superseded the entire access charge regime, but they maintain that § 251(g) never applied in the first place. In other words, the *Order* clarified that the 1996 Act and *Local Competition Order* already forbid LECs from assessing IXCs access charges for intraMTA calls. The LECs, on the other hand, maintain that the *Comprehensive Reform Order* didn't supersede Sprint and Verizon's obligation to pay access charges on intraMTA calls. Instead, they posit that the order did two things: (1) preserved the access charge regime for originating access; and (2) revised the *rates* that LECs could assess for terminating access charges and substituted § 251(b)(5) as the statutory authority for those charges.

The LECs have the better of the argument. The *Comprehensive Reform Order*, 26 F.C.C. Rcd. at 17923 ¶ 778, expressly left in place the pre-1996 framework for originating access charges. And though the *Order* did supersede that framework for terminating access charges, it didn't forbid LECs from continuing to charge them. Instead, the Order capped the rates that LECs could charge, and it subjected them to sunset over either seven or nine years. *See* 47 C.F.R. §§ 51.907, 51.909. Because intraMTA wireless-to-wireline calls involved "exchange access" before the *Comprehensive Reform Order*, they logically continued to involve "exchange access" after the order was promulgated. The *Comprehensive Reform Order* doesn't entitle Sprint and Verizon to any refunds for the remaining three years either.

## C.

Sprint and Verizon assert that several out-of-circuit opinions support their position.[43] All but one of those was decided before the *Comprehensive*

---

[43] (1) *Alma*; (2) *Atlas*; (3) *W. Radio Servs. v. Qwest Corp.*, 678 F.3d 970 (9th Cir. 2012);

*Reform Order* was issued,[44] and none addressed the situation we confront here.

*Alma*, *Atlas*, and *Western Radio* are inapposite for the same reason: They didn't address what compensation IXCs must pay to LECs for intraMTA wireless-to-wireline calls. Instead, they held only that CMRS providers and LECs must pay *each other* reciprocal compensation for intraMTA calls.[45] Though the nature of the traffic is important, the FCC has told us that the exemption in § 251(g) also depends "on *to whom* the service is provided." *Intercarrier Compensation Order*, 16 F.C.C. Rcd. at 9165 ¶ 30 (emphasis added). True, there's certainly *dicta* in those cases that appear to lend some support to Sprint and Verizon's position. But the differences in the facts—and, as a result, the holdings—between those cases and this one matter. Because the LECs in that trio of cases weren't providing CMRS providers with exchange access, Sprint and Verizon's reliance on them is misplaced.

Unlike *Atlas*, *Alma*, and *Western Radio*, *INS II* and *RIITA* at least involve wireless-to-wireline traffic that is routed through an intermediary.[46]

---

(4) *Iowa Network Servs., Inc. v. Qwest Corp. (INS II)*, 466 F.3d 1091 (8th Cir. 2006); (5) *Rural Iowa Indep. Tel. Ass'n v. Iowa Utils. Bd. (RIITA)*, 476 F.3d 572 (8th Cir. 2007).

[44] Those courts could *only* have rested their holdings on the 1996 Act's text and the *Local Competition Order*. And, as explained above, the traffic at issue in this case involves "exchange access," and the *Local Competition Order* didn't explicitly supersede the pre-1996 access charge framework.

[45] *Alma*, 490 F.3d at 627 ("[W]e are bound by circuit precedent to hold that calls from a land line to a cell phone placed and received within the same major trading area are . . . subject to . . . reciprocal compensation . . . ."); *Atlas*, 400 F.3d at 1264 ("The RTCs in the instant case have a mandatory duty to establish reciprocal compensation agreements with the CMRS providers . . . . Nothing in the text of these provisions provides support for the RTC's contention that reciprocal compensation requirements do not apply when traffic is transported on an IXC network."); *W. Radio*, 678 F.3d at 988 ("We conclude that the arbitrator, PUC, and district court erred in determining that the involvement of an IXC altered the parties' obligation to pay reciprocal compensation for telecommunications traffic that originates and terminates within the same MTA.").

[46] *See INS II*, 466 F.3d at 1095 (noting that "INS and Qwest [we]re intermediary carriers"); *RIITA*, 476 F.3d at 577 ("Qwest merely acts as a conduit to facilitate what is

And *INS II* and *RIITA* do contain language that, at first blush, appears to support Sprint and Verizon's position.[47] But, again, critical factual differences between those cases and this one make plain that they're distinct.

In *INS II*, Qwest was acting as "transiting carrier," not an IXC, because it was connecting calls within the *same exchange area*—it transported the traffic only "approximately six blocks."[48] By definition, that traffic couldn't have involved "exchange access," because "telephone toll service" requires a call to be placed between "stations in *different exchange areas*." 47 U.S.C. § 153(48) (Supp. 1997) (emphasis added). And because § 251(g) only grandfathered in the pre-1996 access charge regime for "exchange access," reciprocal compensation must have applied.

Moreover, upon close inspection, *INS II* didn't hold that *federal regulations* required reciprocal compensation to be paid for the intraMTA wireless-to-wireline calls that were routed through a transiting carrier. Instead, the Eighth Circuit affirmed based on how those charges were treated by *state regulators*:

> *In the absence of a clear mandate from the FCC or Congress* stating how charges for this type of traffic should be determined, or what type of arrangement between carriers should exist, the Act has left it to the state commissions to make the decision, as long as it does

essentially a transaction between a wireless carrier and a [LEC].").

[47] *See INS II*, 466 F.3d at 1096–97 ("In this case, the calls originate and terminate within the same local MTA; therefore, they are considered to be 'local' calls. According to the FCC's ruling, because these calls are 'local,' they are to be governed by reciprocal compensation arrangements."); *RIITA*, 476 F.3d at 577 (holding that LECs couldn't "make *transiting* carriers pay access charges for intraMTA calls instead of seeking payment directly from the originating carriers").

[48] *Iowa Network Servs., Inc. v. Qwest Corp.*, 385 F. Supp. 2d 850, 855 (S.D. Iowa 2005). There's also no indication that the traffic at issue in *RIITA* crossed exchange boundaries. In fact, *RIITA*, 476 F.3d at 578, implicitly acknowledged that intraMTA wireless-to-wireline calls that were "carried by an IXC" were "subject to access charges."

No. 18-10768

not violate federal law and until the FCC rules otherwise.[49] That makes sense. Because the traffic at issue was intrastate, regulation of that traffic fell to state authorities.[50] And the Iowa Utilities Board was free to resolve that as it saw fit, so long as it didn't "violate federal law." *INS II*, 466 F.3d at 1097. But what the IUB decided to require doesn't tell us anything about whether LECs could assess access charges for intraMTA wireless-to-wireline calls *under federal law*.

Contrary to what they contend, Sprint and Verizon aren't in the same position as the "transiting carriers" in *INS II* and *RIITA*. Of course, neither *INS II*'s nor *RIITA*'s reasoning turned on the distinctions that we've drawn. But that's exactly the point. Those cases, which involved matters of state law, didn't turn on the 1996 Act's text. We needn't follow those inapposite decisions. After all, a district court within the Eighth Circuit—when confronting the exact question we do here—declined to do so.[51]

IV.

With the legal framework sorted out, we turn to the three claims before us: (1) Sprint and Verizon's federal-law claims against the LECs for refunds of

---

[49] *INS II*, 466 F.3d at 1097 (emphasis added). *RIITA*, 476 F.3d at 577, merely "reiterate[d] what [the Eighth Circuit] said in [*INS*] *II*."

[50] Before the 1996 Act, the FCC had the authority to regulate only *inter*state access charges. *See* 47 U.S.C. § 152 (1934). The 1996 Act permitted the agency to preempt state regulation of telecommunications under § 251(b)(5). *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 378 n.6 (1999) ("But the question in these cases is not whether the Federal Government has taken the regulation of local telecommunications competition away from the States. With regard to the matters addressed by the 1996 Act, it unquestionably has."); *In re FCC 11-161*, 753 F.3d 1015, 1120 (10th Cir. 2014) ("Congress appears to grant plenary authority to the FCC through § 251, and [other provisions of the 1996 Act] do not preclude the FCC from interpreting § 251(b)(5) to allow preemption of state regulation over intrastate access charges."). The FCC didn't invoke that power for access charges until after both *INS II* and *RIITA* were decided. *See Comprehensive Reform Order*, 26 F.C.C. Rcd. at 17916 ¶ 764.

[51] *See Sprint Commc'ns Co. v. Butler-Bremer Mut. Tel. Co.*, No. C 14-3028-MWB, 2014 WL 4980539, at *4 (N.D. Iowa Oct. 6, 2014).

the access charges they paid; (2) the LECs' claims and counterclaims against Sprint, Verizon, and Level 3 for unpaid access charges; and (3) Sprint and Verizon's claims for a declaratory judgment stating that they don't owe the LECs access charges going forward.

The first two claims turn on the same issue: whether the LECs were permitted, under federal law, to impose access charges on IXCs for intraMTA wireless-to-wireline traffic. As we explained above, they could do so, both before and after the *Comprehensive Reform Order* was promulgated. Therefore, because the LECs filed access charge tariffs with the FCC and state regulators, the filed-rate doctrine requires Sprint, Verizon, and Level 3 to pay those charges.[52] The dismissal of Sprint and Verizon's claims for damages is AFFIRMED. For the same reason, the summary judgment on the LECs' claims and counterclaims is also AFFIRMED.

Sprint's and Verizon's claim for declaratory relief is another matter. As of July 1, 2018, LECs that qualify as price cap carriers—or competitive LECs that opted into price cap regulation—can no longer impose terminating access charges. Accordingly, Sprint and Verizon could be entitled to declaratory relief as to at least *some* of the LECs. The parties don't explain which defendant LECs, if any, are price cap carriers, and the district court didn't make findings

---

[52] "The filed rate doctrine recognizes the broad authority granted to agencies . . . to determine whether the rates, including the services, classifications, and practices included in the filing, are reasonable." *Medco Energi US, L.L.C. v. Sea Robin Pipeline Co.*, 729 F.3d 394, 398 (5th Cir. 2013) (per curiam). That "doctrine bars judicial recourse against a regulated entity based upon allegations that the entity's 'filed rate' is too high, unfair or unlawful." *Tex. Commercial Energy v. TXU Energy, Inc.*, 413 F.3d 503, 507 (5th Cir. 2005). "Simply stated, the doctrine holds that any 'filed rate'—that is, one approved by the governing regulatory agency—is per se reasonable and unassailable in judicial proceedings brought by ratepayers." *Id.* at 508; *see also Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 (1981) ("No court may substitute its own judgment on reasonableness. . . ."). "Deviation[s] from [filed rates] aren't] permitted upon any pretext." *Louisville & Nashville R.R. v. Maxwell*, 237 U.S. 94, 97 (1915).

on that question.  Its failure to do so is entirely understandable, because, at the time it dismissed Sprint and Verizon's claims in 2015, *all LECs* were still entitled to assess terminating access charges.  Though that decision was undoubtedly correct when made, the realities of litigating a complex MDL have changed the circumstances.  Consequently, we VACATE and REMAND the dismissal of Sprint's and Verizon's claim for declaratory relief.  We place no limit on the matters that the conscientious district court may consider on remand, and we give no hint as to what decisions it should make.